# Richmond

## James T. Powell and John S. Daisy v. Samuel B. Field and Joseph S. Pruitt.

November 13, 1930.

Present, Prentis, C. J., and Epes, Hudgins, Gregory and Browning, JJ.

*George L. Doughty, Jr.,* and *John E. Nottingham,* for the appellants.

*Gunter & Gunter* and *James E. Heath,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

This controversy is over 23.35 acres of land, a part of "Horse Marsh," near Assateague Island, in Accomac county. The appellants claim the land by virtue of a lease, or assignment, bearing date September 4, 1923, from the Commonwealth through the oyster inspector of that district.

The appellees, through their predecessors in title, claim the same land by virtue of a patent, bearing date April 16, 1897, from the Register of the Land Office, wherein the Commonwealth granted to Samuel M. Field 114.56 acres, described by metes and bounds, of which the 23.35 acres in dispute is a part. The appellants filed a bill in equity, alleging that the grant from the Commonwealth was invalid, and stating that by virtue of their lease from the oyster inspector they took possession of the land, planted oysters, paid taxes, etc., and remained in peaceful possession until sometime in 1928, when one of the appellees attempted to take the same, planted oysters and clams thereon and built a watch-house on the marsh adjacent to the land. The appellee, Joseph S. Pruitt, is lessee of

Samuel B. Field, who is the immediate grantee from Samuel M. Field. The prayer for injunction was denied, the bill dismissed, and thereupon the complainants obtained an appeal to this court.

It appears that on November 28, 1887, Samuel M. Field made entry on the 114.56 acres of land, pursuant to a land office treasury warrant; the county surveyor on December 9, 1887, made the necessary legal survey, and on January 6, 1888, the affidavit required by section 2341 of the Code of 1887 (section 459, Code of 1919), which is as follows:

"The said Register (referring to the Register of the Land Office) shall not issue any grant for land upon any survey heretofore made and not yet carried into grant (other than an inclusive survey), or made hereafter, unless there be endorsed on such survey an affidavit of the person applying for the grant, as well as that of the surveyor making the survey, that they verily believe that the land embraced in the survey has not been previously appropriated, or that it was at the time of the entry thereof liable to entry," etc.

The above section requires not only the affidavit of the surveyor, but also the affidavit of the holder of the warrant to be attached to the survey. The two affidavits, the plat and the certificate of survey must accompany the application and be filed with the Register of the Land Office before the applicant is entitled to a grant from the Commonwealth. Before Samuel M. Field made the required affidavit and filed his proof with his application with the Register of the Land Office, the General Assembly passed the following act, which became effective on February 24, 1888:

"Be it enacted by the General Assembly of Virginia, that all unappropriated marsh or meadow lands lying on the eastern shore of Virginia, which have remained

ungranted, and which have been used as a common by the people of this State, shall continue as such common, shall remain ungranted, and no land warrant located upon the same. That any of the people of this State may fish, fowl or hunt on any such marsh or meadow lands. This act shall be in force from its passage." Acts 1887–8, page 273, chapter 219.

It is admitted that the 114.56 acres of land, or so much thereof as is not embraced within the term "shores of the sea," was unappropriated marsh or meadow land lying on the eastern shore of Virginia, and had been used as a common by the people of the State.

Chapter 104 of the Code of 1887 (section 2299, et seq.) prescribed the necessary steps to be taken by a person desiring to purchase any public lands authorized by law to be sold, which steps may be briefly summarized as follows: First, he pays into the treasury ten cents for each acre of land desired; thereupon the Treasurer gives him a receipt for the money paid, specifying the purpose for which the payment is made; this receipt is delivered to the Auditor of Public Accounts, who then gives to the purchaser a certificate stating the quantity of land to which he is entitled. This certificate is delivered to the Register of the Land Office and on it he issues a warrant specifying the quantity of land that may be taken. This warrant is then delivered to the county surveyor in any county in the State in which the holder desires to locate. The holder of the warrant is required to make his location known to the surveyor and to have the land surveyed. Within three months the surveyor shall deliver to the holder of the warrant a plat and certificate of survey, showing the quantity of land and its boundaries. This plat and certificate, with the affidavits and application for patent, shall be returned to the Register of the Land Office within a year after the survey is made. Then, and not until then, is the purchaser entitled to a patent.

The question before the court is, just when in the various steps enumerated above does the right of a purchaser become a vested interest in the particular tract? The warrant issued by the Register of the Land Office simply sets out that the purchaser has paid a certain amount of money and in consideration therefor is entitled to a certain number of acres of the public lands. The purchaser has a right at any time until demand for a grant is made to change his location, but once his location and survey is made he has a right, if he pursues the same, to obtain a grant from the Commonwealth for the particular land embraced in the survey.

The appellees contend that the inchoate right of Samuel M. Field, at the time the act in question became effective, was a vested interest, and cite the case of *Morrison* v. *Campbell*, 2 Rand. (23 Va.) 206, as authority in support thereof, in which case the facts were as follows: David Duncan, pursuant to a land office treasury warrant, made entry and surveys of 21,000 acres of land in Greenbrier county, and died in 1791 before obtaining a patent therefor. Wallace and Kirkpatrick were named as his executors and authorized to sell and dispose of his real estate and personal property. James Morrison, in 1806, purchased the surveys and warrant from the executors.

James Welch claimed this land by virtue of an assignment of the entries from David Duncan in 1796, five years after Duncan's death. Welch executed a deed of trust on the land to secure a debt which was not paid and the property was sold by the trustees under the deed of trust, the purchasers at the deed of trust sale later obtaining a patent therefor.

James Morrison filed a bill claiming that the patent issued by the Commonwealth was fraudulently obtained and that he, as an assignee of the executors of James Duncan, was entitled to the land. It was held that warrants

and surveys of land may be assigned, but that a mere entry is not subject to assignment, and that David Duncan at the time of his death had an inchoate right in the land, which was real and not personal estate, that the assignment of the executors was valid and the patent to James Welch's assignees was fraudulently obtained and conveyed no interest, and that they held the legal title as trustees for Morrison.

Here the right of the Commonwealth was not involved. The controversy was between a patentee, who had obtained his patent in a forged assignment of the entry, and the assignee of the executors of a party who had made entry, location and survey.

In the case of *Johnson* v. *Brown*, 3 Call. (7 Va.) 239, at p. 267, it is said: "An entry is the first legal step towards acquiring waste land and gives the person making it, if properly pursued, a preference to a grant, the true definition of an equitable interest. The survey is a progressive legal step; but it is the grant, only, which passes the legal title."

In the case of *French* v. *The Successors of the Loyal Co.*, 5 Leigh (32 Va.), 627, at p. 649, it was held:

"Before the Revolution, all the lands in the country belonged to the king, until granted out by him. There were then, as now, various and successive steps necessary to be taken for the purpose of getting a grant for lands; such as locations or entries, surveys, etc., etc. These various steps gave incipient rights, or equitable interests in the land; and he who took the first legal step, acquired thereby a preference to a grant, provided he followed it up properly. But it was the grant only that passed the legal title." See *Carter* v. *Hagan*, 75 Va. 557.

In *Nichols* v. *Covey*, 4 Rand. (25 Va.) 365, 367, it is said: "The Commonwealth, although she has sold and received payment for the *warrant*, by which an entry is made, has never sold *the land* which is covered by it, until the entry

is carried into grant. The warrant may, at any time, be withdrawn, either before or after the entry becomes vacant as aforesaid, and may be again applied, either in the purchase of that, or any other vacant and unappropriated land. No taxes can be charged for such land, until it is granted to some one by patent."

■ ■ The inchoate right which the holder of a land warrant obtains by entry and survey, the State protects and the owner of such a right may exercise it against all the world except one having a prior right, but the State does not thereby surrender its right to withdraw such lands from patent; and it is such a right which does not become vested, as against the State, until there is an application to the Register of the Land Office, accompanied by plat, survey and proof, for a grant, thereby showing that a certain tract of land has been segregated from other public lands and that the holder of a land warrant has made his final choice. There are numerous decisions outside of Virginia so holding. We cite only a few.

In *Campbell* v. *Wade*, 132 U. S. 34, 37, 10 S. Ct. 9, 10, 33 L. Ed. 240, it is said: "The State was under no obligation to continue the law in force because of the application of anyone to purchase. It entered into no such contract with the public. The application did not bind the applicant to proceed any further in the matter; nor, in the absence of other proceedings, could it bind the State to sell the lands.

"The adjudications are numerous where the withdrawal from sale by the government of lands previously opened to sale has been adjudged to put an end to proceedings instituted for their acquisition. Thus, under the pre-emption laws of the United States, large portions of the public domain are opened to settlement and sale, and parties having the requisite qualifications are allowed to acquire the title to tracts of a specific amount by occupation

and improvement, and their entry at the appropriate land office and payment of the prescribed price. But it has always been held that occupation and improvement of the tracts desired, with a view to preemption, though absolutely essential for that purpose, do not confer upon the settler any right in the land occupied as against the United States, which could impair in any respect the power of Congress to withdraw the land from sale for the uses of the government, or to dispose of the same to other parties. This subject was fully considered in *Frisbie* v. *Whitney*, 9 Wall. 187 (19 L. Ed. 668), where this doctrine was announced. It was subsequently affirmed in the *Yosemite Valley Case*, 15 Wall. 77, 87 (21 L. Ed. 82), where the court said that until all the preliminary steps prescribed by law for the acquisition of the property were complied with, the settler did not obtain any title against the United States, and that among these were entry of the land at the appropriate land office and payment of its price. 'Until such payment and entry,' the court said, 'the acts of Congress give to the settler only a privilege of preemption in case the lands are offered for sale in the usual manner; that is, the privilege to purchase them in that event in preference to others. The United States by those acts enter into no contract with the settler, and incur no obligation to any one that the land occupied by him shall ever be put up for sale. They simply declare that in case any of their lands are thrown open for sale the privilege to purchase them in limited quantities, at fixed prices, shall be first given to parties who have settled upon and improved them.'"

*Russian-American Packing Co.* v. *United States*, 199 U. S. 570, at p. 578, 26 S. Ct. 157, 159, 50 L. Ed. 314:

"When this payment is made, the other prerequisites having been complied with, the settler is then entitled to

a certificate of entry from the local land office and ultimately to a patent. *The Yosemite Valley Case*, 15 Wall. 77, 87, 21 L. Ed. 82, 85; *Campbell* v. *Wade*, 132 U. S. 34, 38, 10 S. Ct. 9, 33 L. Ed. 240, 242; *Shiver* v. *United States*, 159 U. S. 491, 16 S. Ct. 54, 40 L. Ed. 231.

"The case of *Lytle* v. *Arkansas*, 9 How. 314, 13 L. Ed. 153, is much relied upon by the petitioner, and is carefully criticised and distinguished by Mr. Justice Field in the *Yosemite Valley Case*. In that case proofs were taken and decided, both by the Register and the Receiver of the Land Office, to be sufficient, and the money was paid by the claimant and received by the commissioner; but through misconduct or neglect the Register refused afterward to permit claimant to enter the section, and it was held that the right of the preemptor thus acquired could not be impaired by a selection of land by a subsequent act of Congress. Commenting on this case, Mr. Justice Field observed, in the *Yosemite Valley Case* (p. 93 [of 15 Wall.]) that:

" 'The whole difficulty in the argument of the defendant's counsel arises from his confounding the distinction made in all cases, whenever necessary for their decision, between the acquisition by the settler of a legal right to the land occupied by him as against the owner, the United States; and the acquisition by him of a legal right as against other parties to be preferred in its purchase, when the United States have determined to sell. It seems to us little less than absurd to say that a settler or any other person by acquiring a right to be preferred in the purchase of property, provided a sale is made by the owner, thereby acquires the right to compel the owner to sell, or such an interest in the property as to deprive the owner of the power to control its disposition.' "

In *Union Pacific R. R. Co.* v. *Harris*, 215 U. S. 386, at p. 388, 30 S. Ct. 138, 139, 54 L. Ed. 246, it is said:

"While the power of Congress over lands which an individual is seeking to acquire under either the preemption or the homestead law remains until by the payment of the full purchase price required by the former law or the full occupation prescribed by the latter, yet under the general land laws of the United States one who, having made an entry, is in actual occupation under the preemption or homestead law, cannot be dispossessed of his priority at the instance of any individual. *Hastings, etc., R. Co.* v. *Whitney*, 132 U. S. 357, 363, 364, 10 S. Ct. 112, 33 L. Ed. 363, 366, 367. In other words, one who has taken land under the preemption or homestead law acquires an equity of which he cannot be deprived by any individual under the like laws."

*Payne* v. *New Mexico*, 255 U. S. 367, 370, 371, 41 S. Ct. 333, 334, 65 L. Ed. 680:

"The provision under which the selection was made was one inviting and proposing an exchange of lands. By it Congress said in substance to the State: If you will waive or surrender your titled tract in the reservation, you may select and take in lieu of it a tract of like area from the unappropriated non-mineral public lands outside the reservation. Acceptance of such a proposal and compliance with its terms confer a vested right in the selected land which the land officers cannot lawfully cancel or disregard. In this respect the provision under which the State proceeded does not differ from other land laws which offer a conveyance of the title to those who accept and fully comply with their terms.

■ "In the brief for the officers it is frankly and rightly conceded to be well settled that 'a claimant to public land who has done all that is required under the law to perfect his claim acquires rights against the Government and that his right to a legal title is to be determined as of that time'; and also that this rule 'is based upon the theory

that by virtue of his compliance with the requirements he has an equitable title to the land; that in equity it is his and the Government holds it in trust for him.' See *Lytle* v. *Arkansas*, 9 How. 314, 333, 13 L. Ed. 153; *Stark* v. *Starrs*, 6 Wall. 402, 417–418, 18 L. Ed. 925; *Ard* v. *Brandon*, 156 U. S. 537, 543, 15 S. Ct. 406, 39 L. Ed. 524; *Payne* v. *Central Pac. Ry. Co.*, 255 U. S. 228, 41 S. Ct. 314, 65 L. Ed. 598."

The subject is fully discussed by Mr. Justice Van Devanter in *Wyoming* v. *United States*, 255 U. S. 490, 41 S. Ct. 393, 65 L. Ed. 742.

■ The rule stated and consistently adhered to in these opinions is that before the interest of an applicant to purchase public lands becomes vested, as against the State, he must have fully performed all the requirements of law, thereby entitling him to a patent, but if the State withdraws the land from sale before he does all that he is required to do he has no vested interest.

In Virginia, he still has his warrant and he may locate the same upon any other public land which the land law authorizes to be sold, and that is all that he bought from the State—a right, by taking the proper steps in the time required, to obtain for himself a certain number of acres of public lands subject to sale. The statute requires that the plat and survey be returned to the Register of the Land Office within one year after the survey is completed (section 2325) and a grant to be issued within not less than six nor more than nine months after the right to a grant is completed (section 2349).

■■ The record in the instant case does not disclose when the plat and survey were filed with the Register of the Land Office, but it does show that the grant was issued more than nine years after the survey was made. No evidence is offered by either side to explain this long delay. The grant embraced lands which the State had withdrawn

from sale before Samuel M. Field had fully performed the conditions which would have entitled him to a patent. The Register of the Land Office was expressly forbidden to issue a grant for the type of lands embraced in this patent; the same is therefore void. The grant being issued contrary to law, a subsequent grantee from Samuel M. Field acquired no right thereunder.

■    Chapter 128 of the Code of 1919 (sections 3219–3298) duly authorized the land in question to be assigned for the purposes stated in the lease from the oyster inspector. It follows, therefore, that the decree complained of must be reversed and an injunction granted in accordance with the prayer of the appellants' bill.  It is so ordered.

*Reversed.*