The NATURE CONSERVANCY,
Plaintiff,

v.

MACHIPONGO CLUB, INC., Defendant.

Civ. A. No. 74–461–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

July 14, 1976.

David S. Favre, Newport News, Va., for plaintiff.

Herbert H. Bateman, Newport News, Va., for defendant.

## MEMORANDUM OPINION

CLARKE, District Judge.

The parties to this suit each own land on the northern end of Hog Island, a barrier island located in the County of Northampton, Virginia. The Nature Conservancy seeks monetary and injunctive relief for alleged acts of trespass upon its real property by the members, guests, employees and agents of the Machipongo Club, Inc. In addition to specific acts of alleged trespass on the upland portions of Hog Island, the dispute concerns the ownership and/or right to use the marsh and meadowland and beaches of Hog Island as well as certain roads or trails located on the island.

Hog Island is one of several barrier islands bordering the eastern coast of Virginia's Eastern Shore. By definition, a barrier island acts as a shield to protect the mainland from the direct force and effect of the Atlantic Ocean. The forces of nature have combined over time to erode the southern end and to build up the northeast section of the island. By virtue of a series of hurricanes in the 1930's, the small town of Broadwater, located on the southern tip of Hog Island, was forced out of existence. The land once occupied by the town is submerged. There are no longer any permanent residents living on the island.

The Nature Conservancy is a non-profit District of Columbia corporation headquartered in Arlington, Virginia. The purpose of the organization is to preserve the complete spectrum of biological diversity now existing on the Continent of North America. In fulfillment of this goal, The Nature Conservancy has purchased portions of and entire barrier islands bordering the eastern coast of Virginia's Eastern Shore. Once land is acquired, The Nature Conservancy follows its stated purposes of preservation and scientific study by curtailing certain human uses which it believes would interrupt the processes of nature.

The Machipongo Club, Inc., a West Virginia corporation, was formed for the express purpose of acquiring a parcel of land

on the northern end of Hog Island so as to provide a clubhouse for the recreational enjoyment of its members and guests. The recreational pursuits of club members and guests have included fishing, swimming, hunting, and birding.

The case is before the Court for decision on the evidence presented at trial and the post-trial memoranda of counsel. Jurisdiction for the action is founded upon 28 U.S.C. §§ 1332(a)(1) and 1332(c). Venue is based upon 28 U.S.C. § 1391.

The Nature Conservancy [hereinafter referred to as the Conservancy] claims that the Machipongo Club, Inc.'s [hereinafter referred to as the Club] members, guests, agents and employees have committed numerous acts of trespass on land owned by the Conservancy. The Conservancy asserts ownership of the entire northern section of Hog Island including the beaches and marshland to the ordinary low-water mark, but excluding a 5.4 acre parcel owned by the Club. The basis for the Conservancy's action of trespass includes the Club's admitted use of the following areas on the northern section of the island:

1. The Atlantic beach between mean high water and mean low water.

2. The marsh and meadowlands of Hog Island.

3. A "right-of-way" beginning at the Machipongo Clubhouse (formerly the Coast Guard Station) and running to the Atlantic beach [hereinafter referred to as the beach access road].

4. A "road" running south from the beach access road for the length of the island thereby bisecting the Conservancy's property [hereinafter referred to as the north-south road].[1]

In defense, the Club denies the Conservancy has shown proof of any trespass on land which the Club admits the Conservancy owns and states that the Conservancy, in fact, does not have title to the beach access road, the beach face, the north-south road, or the marsh and meadowland of Hog Island.

Additional acts of trespass in driving vehicles over sand dunes and through bird nesting areas are charged by the Conservancy but are also denied by the Club.

I

### A. *The North-South Road*

Three legal theories are offered by the Club in support of its alleged right to travel the north-south road: (1) the United States Coast Guard was conveyed the beach access road right-of-way thereby giving the Coast Guard and its successors-in-title the right to use the intersecting north-south road; (2) by implied dedication and acceptance by continuous public use, the north-south road has become a public road; and (3) the prescriptive use of the north-south road for more than twenty years by the Club's predecessor-in-title has created either a public or private right-of-way.

(1) The Club's contention that the use of the north-south road is a part of the right, appurtenance and advantage conveyed to the Club by the Coast Guard is without merit. Assuming, as the Club asserts, the Coast Guard was conveyed the right-of-way referred to previously as the beach access road, there is still no legal or evidentiary support for the proposition that an intersecting roadway necessarily becomes a concurrent right, appurtenance and advantage to the possessor of the beach access road easement. No reference to a north-south road is shown in the Coast Guard plat [Defendant's Exhibit 9] relied upon by the Club as showing a conveyance of the beach access road. There is no mention of the north-south right-of-way in the Conservancy's deed from the O'Neils requiring reservation of such a road from the land conveyed to the Conservancy. The logic and evidence supporting the Club's claim of

---

1. Throughout the opinion the word "road" is used in its generic sense "mean[ing] all kinds of ways, whether they be carriageways, driftways, bridleways, or footways." *Terry v. McClung*, 104 Va. 599, 52 S.E. 355, 356 (1905).

a beach access road does not extend to embrace the conveyance of a north-south right-of-way.[2]

(2) The second theory of the Club is that the north-south roadway is a public road. The Club contends the road belongs to the public by an implied dedication which was accepted by virtue of continuous public use.

The well-settled law in Virginia concerning dedication of private land to the public was succinctly stated in *Buntin v. City of Danville*, 93 Va. 200, 24 S.E. 830 (1896) in the following language:

"  .   .   . 'The principle of dedication by the act of the owner of land,' said Judge Staples in Harris' Case, 20 Grat. 833, 'is now almost universally recognized as a part of the common law in this country.' Dedication is an appropriation of land by its owner for the public use. It may be express or implied. It may be implied from long use by the public of the land claimed to have been dedicated. Dedication is not required to be made by a deed or other writing, but may be effectually and validly done by verbal declarations. The intent is its vital principle, and the dedication may be made in every conceivable way that such intention may be manifested. It must, however, be manifested by some unequivocal act, and is not effectual and binding until accepted. When the intention of the owner to make the dedication has been unequivocally manifested, and there has been acceptance by competent authority, or such long use by the public as to render its reclamation unjust and improper, the dedication is complete. [citations omitted] And when it is complete it is irrevocable." *Id.* 24 S.E. at 830.

This language was quoted with approval in *Greenco Corporation v. City of Virginia Beach*, 214 Va. 201, 198 S.E.2d 496, 501 (1973).

■ From *Buntin*, it is seen that there must be an *appropriation* of the land by the private citizen, which, when made, is irrevo-

cable and an *acceptance* by the public of the land.

■ Dedication of land for use as a public road may be implied from the owner's actions and the long and continuous use of the roadway by the public. *City of Norfolk v. Meredith*, 204 Va. 485, 132 S.E.2d 431, 433 (1963). Likewise, acceptance of dedicated land may be implied by long-continued use by the public under circumstances rendering reclamation unjust and improper. The intention of the owner is the paramount consideration; therefore, the owner's intention to dedicate his land must be "unequivocally manifested." *Buntin v. City of Danville*, 93 Va. 200, 24 S.E. 830 (1896). In making a determination as to whether there has been a dedication and acceptance, "it is proper that the court consider the intent, purpose, importance and benefit of the dedication to the public, as well as other factors." *Greenco Corporation v. City of Virginia Beach, supra* at 198 S.E.2d 501.

The north-south road runs generally from the southern tip of Hog Island parallel to the marshland on the western side of the island until it intersects the beach access road on the northern end of the island. The course of the north-south road, referred to by some witnesses as a "trail," has changed only slightly over the years. The road has never been maintained by the state and any surfacing has been limited to placing oyster shells on a southern portion of the road. (Tr. 304–05, 315–16). Throughout its existence, the road could be described best as unimproved. If repairs were needed, the people would use sand to fill holes on its southern end but on the less traveled northern end, repairs would be forsaken for the creation of a new path around impassable portions. The greatest utilization of the north-south road occurred prior to about 1941 when the Town of Broadwater was still in existence. For a few years (about 1936–1940), the Coast Guard maintained stations on both ends of the island and used the north-south road for travel between the

---

2. A beach access road is shown on a 1935 Coast Guard plat which was allegedly submitted as part of the deed of conveyance from the O'Neil family to the Coast Guard.

stations. (Tr. 246–65, 291–92). It is clear, however, that the residents of Broadwater, as well as the Coast Guard, preferred the use of the beach when the tide permitted for travel between the north and south ends of the island. With the disappearance of the Town of Broadwater, use of the north-south road on a regular basis was limited to the Coast Guard, although the road has provided the only inland travel for all those who have come to fish, hunt, bird watch or otherwise enjoy the island. The north-south road carried people, ponies or ox-carts until the second decade of this century when motor vehicles were introduced to the island. (Tr. 260). Motor vehicles are currently being used by the Club on this road.[3] (Tr. 322–23).

█ The evidence reveals that the north-south road has been used continually for more than seventy years by residents and visitors to Hog Island and that use of the road has not been abated although there is less traffic due to the absence of permanent residents. Such long and continuous use of a roadway by the public raises the presumption of a dedication by the owners of the land. *Buntin v. City of Danville*, 93 Va. 200, 24 S.E. 830 (1896).

Ownership of the land containing the portion of the north-south road running through the Conservancy's land has at various times been in the Commonwealth of Virginia, the Powells by virtue of a land grant in 1901, the Duntons, Browns and the Edward O'Neil family.[4] There is no evidence that any of these parties either complained of the use by others of the north-south road or ever verbally or in writing manifested an intention to dedicate land for a public road.

In *Ocean Island Inn, Inc. v. City of Virginia Beach*, 216 Va. 474, 220 S.E.2d 247 (1974), the consequences of a completed dedication and the methods of showing acceptance of dedicated land were set forth:

". . . Since a completed dedication imposes the burden of maintenance and potential tort liability upon the public, a dedication does not become complete until the public or competent public authority manifests an intent to accept the offer. Such intent can be manifested expressly; by implication from public user of requisite character, *Buntin v. Danville City*, 93 Va. 200, 204–205, 24 S.E. 830 (1896); or by implication from an 'exercise of jurisdiction and dominion' by the governing authority, *Staunton v. Augusta Corporation*, 169 Va. 424, 436, 193 S.E. 695, 699 (1937)." *Id.* 220 S.E.2d at 250.

No evidence has been introduced tending to show an expression by any public authority of an intent to accept the north-south road for public use, or to exercise any control over the use of the road which would manifest such an intent. The Club relies solely on the public use of the north-south road to show a willingness of the public to assume the burden of maintenance and potential tort liability.

The historical use of both the north-south road and the rest of the island is one of free access to *all* lands, marshes, and shorelines. People living and working on the island continually traveled within its borders without regard for boundary lines. No one objected, for such activity was either encouraged or condoned. It is apparent that, to many, this utopian approach to land ownership blurred the concept of public and private land on the uninhabited portions of the island.

Little attention has ever been given by the public to the maintenance of the north-south road beyond its southern boundaries. Less traveled sections of the road which became impassable were circumvented rather than repaired. No substantial improvement of the roadway was ever made. The beach face, not the north-south road, was

---

**3.** Various maps introduced by the Club as trial exhibits show an unimproved road running in a north-south direction for most of the length of the island. The earliest map is dated 1851 and the most recent is a 1968 U.S. Geological Survey map.

**4.** Plaintiff's exhibits 1–5 are deeds of conveyance between these parties.

the favored route of travel to and from the northern end of the island.

■■ From these facts, the Court can find neither an intent by the various land-owners to permanently dedicate or appropriate the use of their land over which the north-south road runs nor an acceptance of the land as a public road. Furthermore, the circumstances of the case do not render the reclamation of the land by the Conservancy unjust. There has been no showing of a loss of livelihood or bar of access by the Club to its own land if access to the seldom used north-south road is closed. Where acceptance of a dedication is based on public use and the circumstances of the case do not support acceptance of the land as a public road, the dedication remains incomplete. *City of Norfolk v. Meredith*, 204 Va. 485, 132 S.E.2d 431 (1963).

(3) The Club bases its argument for a public prescriptive right to use the north-south road on a theory that continuous and uninterrupted public use under a claim of right that is adverse to the owner's interest for a sufficient period of time, creates a public prescriptive right to use the north-south road. *See* 39 C.J.S. Highways § 3 (1944). The Conservancy contends that under this standard the Club has failed to show hostile or adverse use of the road. The Club replies that recurring use of a part of private land as a right-of-way is either hostile or adverse to the extent the use is inconsistent with the owner's fee simple title, or the duration of the use raises the presumption of an adverse use under a claim of right. If the frequency or duration of use has not been adequately shown, then the Club argues the recurring use is evidence of an implied dedication and acceptance.

■■ The Club seeks to draw a distinction between creation of a public road by dedication and acceptance and the establishment of an easement by public prescription. The general rule in Virginia is that the public acquires only an easement in land condemned or dedicated as a public highway and the fee remains in the owner subject to the right of passage. *Bond v.*

*Green*, 189 Va. 23, 52 S.E.2d 169, 173 (1949). In Virginia, therefore, prescriptive use of a road by the public is evidence of an implied dedication and acceptance of a road for public use.

■ The same evidence offered as proof of a public prescriptive easement was presented in support of classifying the north-south roadway as a public road. No Virginia authority has been cited to distinguish the concept of a public road easement from an implied dedication and acceptance of land for use as a public road. Under the facts of this case, the Court can find no distinguishing features of the law.

■ To establish a private easement by prescription, the Club is required to show that the use of the road was adverse, under a claim of right, exclusive, continuous, uninterrupted, and with the knowledge and acquiescence of the landowner for at least twenty years. *Robertson v. Robertson*, 214 Va. 76, 197 S.E.2d 183, 188 (1973). From the evidence, there is ample proof of a continuous and uninterrupted use of the north-south road by the Club and its predecessor-in-title for more than twenty years. Briefly stated, the Club's grantor, the Coast Guard, used the north-south road from 1935 until abandonment of the station in 1964. The use of the road was otherwise continuous and uninterrupted, exceeding a period of twenty years. The Conservancy's grantor never objected to use of the north-south road.

■ The Club's and its predecessor-in-title's "open, visible, continuous, and unmolested use" of the north-south road for at least twenty years raises the presumption of use under a claim of right. The burden rests on the Conservancy to rebut the presumption by showing the use of its property was merely permissive. *Craig v. Kennedy*, 202 Va. 654, 119 S.E.2d 320, 323 (1961). However, the Club has failed to show an exclusive use of the road necessary to establish a private easement over the Conservancy's land. In a similar case, *Stanley v. Mullins*, 187 Va. 193, 45 S.E.2d 881 (1948), use and enjoyment of a road over private

land was held not to create either a private easement or a public road. As to creation of a private easement, the Court stated that the use of the road by those alleging a private road was in common with people and dependent for its enjoyment on similar rights in others. *Id.* at 884–85. The absence of a claim independent of all others precludes establishment of the necessary exclusiveness required to create a private easement.

For the reasons stated, the north-south road traversing the Conservancy's land is held to be neither a public road nor a private easement and the Club's members, guests, employees, and agents have no right to use this road without the permission of the Conservancy.

### B. *The beach access road*

The Conservancy contends that the Club, upon purchase of a 5.4 acre parcel of land containing the United States Coast Guard station at the north end of Hog Island, acquired no right-of-way, easement or other right which would permit the Club to travel outside the 5.4 acre parcel. Allegedly, this prohibits use of the beach access road which runs from the former Coast Guard station in an easterly direction toward the Atlantic shoreline of the island. From 1935 until the property was sold to the Club, the Coast Guard had maintained the road by the addition of oyster shells to provide a surface adequate to withstand the natural elements. When originally improved, the beach access road ended at the beach. Accretion and alluvium to the northern Atlantic shoreline of the island in recent years have substantially increased the area of land between the Coast Guard station and the beach.

■ In 1935 the O'Neil family conveyed with general warranty a 5.4 acre parcel of land on the northern end of Hog Island to the United States of America for use as a Coast Guard station. The conveyance included all privileges and appurtenances thereunto belonging and was represented by a deed and plat. The plat (Defendant's Exhibit 9) shows the dimensions of the 5.4 acre. parcel and a portion of a right-of-way at the southeast corner of the property described as "Location of 50′ Right of Way about 780′ to Higher Beach." The Conservancy argues that omission from the deed of the language of the right-of-way is evidence of an intention to limit the conveyance to a 5.4 acre parcel. The rule in Virginia is that a grantor is bound by the description of property contained in a plat which has been incorporated by reference into a deed. *Bossieux v. Shapiro*, 154 Va. 255, 153 S.E. 667, 668 (1930). The description of the 5.4 acre parcel in the deed between the United States and the O'Neils concluded with the phrase, "all of which is shown on a map, attached hereto, by United States Coast Guard, Civil Engineers' Office, Washington, D. C., Nos. 101, 166, dated 10/11/35." Consequently, a right-of-way was conveyed to the Coast Guard by the O'Neil family by virtue of the December 6, 1935, deed and incorporated plat.

■ In 1966 the Coast Guard station property was sold at public auction to the Club. A quitclaim deed was executed between the parties conveying without warranty "the same piece or parcel of land" which was conveyed to the United States of America from the O'Neil family, "Together with the improvements thereon, and the rights, roads ways [sic], waters, privileges, appurtenances, and advantages, to the same belonging or in anywise appertaining." No express mention is made of an easement or right-of-way to the beach. Nevertheless, the all-inclusive language of the deed, the fact that the Club through one of its organizers had conducted a pre-purchase inspection of the premises, the use of the road by the Coast Guard, and the intended use of the Coast Guard Station by the Club all indicate a belief that the 5.4 acre parcel and the beach access road then existing were being acquired together. There was no exception made in the deed of conveyance of the beach access road right-of-way, nor was there any mention or description of it in the deed of conveyance. Notwithstanding the lack of specificity, the beach access road under the circumstances was transferred to the Club as an appurtenance to the 5.4 acre

parcel described in the quitclaim deed. See *Cushman Virginia Corporation v. Barnes*, 204 Va. 245, 129 S.E.2d 633, 638 (1963).

The remaining question is the length of the Club's right-of-way. Adherence to the 780 foot distance shown on the plat recorded with the deed of conveyance of the 5.4 acre parcel from the O'Neil family to the Coast Guard places the end of the easement near the marsh line existing in 1942 (Defendant's Exhibit 14). If the "higher beach" is used as the demarcation line for the termination of the "about 780'" right-of-way, a correct measurement would not be possible because of a lack of evidence of the meaning of the term "higher beach." There is, however, some evidence of the purpose of the 780 foot easement in the testimony of Edward O'Neil, II, the Coast Guard's predecessor-in-title. Mr. O'Neil stated that the reason for acquiring the right-of-way was never put in writing to his knowledge, but that he got the idea from somewhere that the road was to be used to get equipment across to a high point above high water (O'Neil deposition, pp. 43, 46 & 47). Mr. O'Neil's testimony is admittedly supposition on his part (O'Neil deposition, pp. 30–31). Nevertheless, the 1970 survey of the northern end of Hog Island, introduced into evidence by the Club, supports the conclusion reached by Mr. O'Neil.

The distance of the recorded right-of-way does not accord with the actual use made of the road and the extensions brought about by accretion and alluvium to the northeast shoreline of Hog Island. Sufficient evidence does exist to support a finding that the United States Coast Guard acquired a right-of-way to the beach by prescriptive use. The private easement was gained from continuous and uninterrupted travel to the beach from the Coast Guard Station for more than twenty years.

The Coast Guard acquired the 5.4 acre parcel from the O'Neil family in 1935. A lifesaving station was built within a year. Members of the Coast Guard freely used the island, traveling the north-south road as well as the beach access road which the Coast Guard had improved. Unlike the north-south road, use of the beach access road by the public was probably less extensive. More importantly, a claim of right to use the beach access road in its entirety can be found in the easement granted by the O'Neil family. It is evident that the easement of about 780 feet to the "higher beach" does not lend itself to preciseness and that the functions of the Coast Guard would occasion frequent access to the Atlantic shoreline. The use of the beach access road by the Coast Guard would be for purposes distinct from that of the general public and would emanate from the duties encumbent upon Coast Guard personnel. Furthermore, the beach access road leads to the Coast Guard Station and to no other structure or place on the island. Such circumstances support a finding of use under a claim of exclusive, peculiar and distinct right in the absence of proof to the contrary.

The circumstances dictate a finding of exclusive, continuous and uninterrupted adverse use for more than twenty years of the beach access road by the Coast Guard under a claim of right with the acquiescence of the landowner. See *Robertson v. Robertson*, 214 Va. 76, 197 S.E.2d 183 (1973). Accordingly, the Coast Guard acquired a private easement by prescription from the end of their granted road to the beach face which was later conveyed to the Club as a privilege and appurtenance of the 5.4 acre parcel.

Continued expansion of the beach on the northeast shoreline of Hog Island leaves unanswered the question of whether the prescriptive easement extends to the beach face as it is now constituted. The Club claims it is entitled to the benefit of any accretion or alluvium which has occurred on the northeast section of Hog Island whereby the beach access road has been lengthened. The owner of a shore or river bank enjoys the benefits of accretion and alluvium to his land. *Steelman v. Field*, 142 Va. 383, 128 S.E. 558 (1925). The justification for such a rule is that the great value of being a riparian owner is the right to have access to the water. *Id.* 128 S.E. at

559–60. The same principles apply with equal force to the possessor of an easement to the beach. The purpose of the beach access road is to afford a means of travel between the Coast Guard Station and the beach. The use of the road has continued throughout the period of time in which the beach has been increased by alluvial deposits. There is no sound reason to terminate use because the easement has been lengthened beyond its original dimensions by accretion and alluvium.

C. *The Atlantic beach and the marshland*

The Conservancy has offered evidence to show that the boundaries of its land on Hog Island extend to the low-water mark so as to encompass the Atlantic beach between the mean high-water and mean low-water marks and the marshland to the extent the marshes lie above mean low-water. The Club maintains that the Atlantic beach and the meadows and marshland of Hog Island to which the Conservancy claims ownership are not subject to private ownership. In support, the Club argues that Virginia statutes in effect at the time of the grant of the Powell tract from the Commonwealth of Virginia to the Powells prohibited and continue to prohibit a land grant encompassing "common lands" and "meadows and marshes of the Eastern Shore."[5]

The Conservancy offers the following muniments to sustain its assertion of ownership to the beach and marshes abutting the upland tract of land which it undisputedly owns:

1. A grant dated February 2, 1901, from the Commonwealth of Virginia to E. T. Powell of a certain parcel of land containing 1422½ acres, lying on the north end of Hog Island.

2. A deed dated January 1, 1910, between Edwin T. Powell and Edna P. Powell, his wife, and Edward O'Neil conveying a parcel of land containing 1422½ acres to Edward O'Neil as described in the Powell grant.

3. A deed dated January 6, 1917, between James S. Dunton, Sr., and others, and Edward O'Neil, conveying to Edward O'Neil a parcel of land containing about 424 acres contiguous with the Powell grant on its east and north boundaries.

4. A deed dated October 1, 1921, between Calvin Brown and others, and Edward O'Neil conveying to Edward O'Neil about 231 acres of land immediately south and adjacent to the former Dunton tract.

5. A deed dated December 21, 1970, between George Potter O'Neil and others, and The Nature Conservancy, conveying to The Nature Conservancy the Brown, Dunton and Powell tracts with the express exception of the parcel of land heretofore deeded to the United States Coast Guard in 1935.

The land grant from the Commonwealth of Virginia to the Powells in 1901 conveyed the north end of Hog Island, following in part the shoreline of the Atlantic Ocean at the low-water mark. The chain of title has remained intact and has carried forth the same description of the Powell tract to the Conservancy's deed of conveyance. Section 1339 of the Code of Virginia of 1887, which was in effect at the time of the Powell grant in 1901, set forth the boundaries of land lying on the shores of the sea. The boundary of land abutting the sea is placed at the "low water mark, but no farther, unless where a creek or river, or some part thereof, is comprised within the limits of a lawful survey."[6] The terms of Section

---

5. Sections 1338 and 1339 of the Code of Virginia of 1887. *See also* Va.Code Ann. §§ 62.1–1 and 41.1–4 (1950, as amended).

6. Section 1339 of the Code of Virginia of 1887 reads in full:
"Subject to the provisions of the preceding section, the limits or bounds of the several tracts of land lying on the said bays, rivers, creeks, and shores, and the rights and privileges of the owners of such lands, shall extend to low water mark, but no farther, unless where a creek or river, or some part thereof, is comprised within the limits of a lawful survey."

1339 are expressly subject to the provision of Section 1338, which reads in full:

"*Sec. 1338. Beds of bays, rivers, and creeks, and shores of the sea, ungranted, to remain in common.*—All the beds of the bays, rivers, creeks, and the shores of the sea within the jurisdiction of this commonwealth, and not conveyed by special grant or compact according to law, shall continue and remain the property of the commonwealth of Virginia, and may be used as a common by all the people of the state for the purpose of fishing and fowling, and of taking and catching oysters and other shell fish, subject to the provisions of chapters ninety-five, ninety-six, and ninety-seven, and any future laws that may be passed by the General Assembly; and no grant shall hereafter be issued by the Register of the Land Office to pass any estate or interest of the commonwealth in any natural oyster bed, rock, or shoal, whether the said bed, rock, or shoal shall ebb bare or not."

Contrary meanings are placed by the parties on the wording of Section 1338. The Club interprets Section 1338 as voiding the 1901 Powell grant as it relates to the Atlantic shoreline of Hog Island between mean low water and mean high water, if the Atlantic beach was an ungranted section of the common land of Virginia in 1901. On the other hand, the Conservancy asserts that Section 1338 vests title to the shores of the sea in the Commonwealth of Virginia to assure the public of fishing and fowling rights, but does not prohibit the granting of the shores of the sea to private parties in compliance with statutory procedures.

■ Section 1338 of the Code of 1887 established that Virginia seashores would remain as property of the State unless conveyed by special grant or compact according to law. There is no requirement in the statute that seashores qualifying under the historical doctrine of "common lands" forever remain in that status.[7] The statute contains an express prohibition against grants by the State of its interest in "any

natural oyster bed, rock, or shoal," but there is no corresponding prohibition dealing with the shores of the sea. In *Taylor v. Commonwealth,* 102 Va. 759, 47 S.E. 875 (1904), Section 1338 was viewed as a declaration of the right in the State to the navigable waters and soil under them within the state's territorial limits, sanctioned and supported by common law. It would be inconsistent to read the statute as invalidating provisions within the property law of Virginia concerning the grant of land owned by the State.

■ Operation of Section 1338 on the facts of this case validates the grant of the Commonwealth of Virginia to the Powells in 1901; there being no challenge by the Club to the grant on the ground that it was not validly procured. *Challice v. Clark,* 163 Va. 98, 175 S.E. 770, 774 (1934). Accordingly, the Conservancy's holdings incorporate the Atlantic beach to the ordinary low-water mark as described in its deed of conveyance from the O'Neil family, at least to the extent of what was formerly the Powell tract. There is, however, no evidence of the derivation of title to the Brown and Dunton tracts on which to make a finding of ownership of the beach abutting those tracts.

Ownership of the marsh and meadow land encompassed by the Powell grant in 1901 and eventually conveyed to the Conservancy is governed by a statute enacted in 1888, which provided in full:

"1. Be it enacted by the general assembly of Virginia, That all unappropriated marsh or meadow lands lying on the eastern shore of Virginia, which have remained ungranted, and which have been used as a common by the people of this state, shall continue as such common, shall remain ungranted, and no land warrant located upon the same. That any of the people of this state may fish, fowl, or hunt on any such marsh or meadow lands.

"2. This act shall be in force from its passage."

---

7. See *Miller v. Commonwealth,* 159 Va. 924, 166 S.E. 557 (1932) for a discussion of the

historical doctrine of "common lands" in Virginia.

Acts 1887–88, p. 273, c. 219.

■ The Club contends that the marshland contained in the Powell grant was common land prior to 1901 and must remain as such for public fishing and fowling. The statute expressly prohibits the grant by the Commonwealth of unappropriated marshland (1) lying on the Eastern Shore, (2) which has been used as a common by the people of the Commonwealth, and (3) which has not previously been granted.

The history of Hog Island, as revealed in this case, is embodied in the remembrances of Harvey L. Bowen, a native born on the island in 1901. Mr. Bowen testified that residents and visitors to Hog Island traveled the island at will without objection from landowners (Tr. 274, 275); that the island had a prosperous economy (Tr. 255); that there were no law enforcement officers; that the configuration of the island has been constantly changing (Tr. 257–61); and that the marshland from the north to the south end of the island, with the exception of one estate, was used by everyone for fishing and hunting (Tr. 317, 318). The carefree lifestyle enjoyed by the former inhabitants of Hog Island has been continued by those who now come to the island.

The recollections of Mr. Bowen are limited to his personal observations as a resident of Hog Island and the folklore of the area as relayed by his elders. Mr. Bowen testified in a historical context as to the use of the island by residents and visitors. Contradictory evidence has not been introduced. The Court is of the opinion that Mr. Bowen's testimony fairly relates the lifestyle on Hog Island prior to 1901. As such, there is ample support for the conclusion that the marsh and meadow lands of Hog Island were used as a common by the residents of Virginia.

The remaining elements of the statute have also been satisfied. Title to the northern end of Hog Island prior to 1901 was vested in the Commonwealth of Virginia. This unappropriated land included property owned by the Conservancy and the Club which is traced to the Powell grant. It is undisputed that the marshes and meadow lands in issue lie in the County of Northampton, Virginia, and are part of a barrier island of the Eastern Shore of Virginia.

In *Powell v. Field,* 155 Va. 612, 155 S.E. 819 (1930), the appellants claimed marshland on the Eastern Shore of Virginia by virtue of a lease from the state. The appellees claimed the same land through an 1897 patent granting the land in controversy to appellees' predecessor-in-title. The precise issue before the Court was when in the procedural process does a grantee of unappropriated lands acquire a vested interest. In holding that a grant of land is not complete prior to fulfillment of all statutory requirements, the Supreme Court of Appeals applied the Acts of Assembly 1887–88, p. 273, c. 219, with full force and declared void the grant to appellees' predecessor-in-title. The parties in *Powell* had stipulated that the marshland was previously unappropriated and was used in common. In this case, the Club has borne the burden of proving these elements. Accordingly, any marshes and meadow land included in the grant of the Commonwealth of Virginia to the Powells is null and void. Such lands belong to the people of Virginia for the purposes of fishing, fowling or hunting. Again, there is no evidence of the derivation of the title to the Brown and Dunton tracts and the Court is unable to say whether the marshlands in those tracts are public or not. As to those portions of its land, the Conservancy has failed to carry its burden of proof.

■ The Conservancy argues that, notwithstanding the statutory prohibition of grants of marshland on the Eastern Shore of Virginia, the Virginia legislature has retroactively validated the Powell grant. Va. Code Ann. § 41.1–6 (1970 Repl.Vol.). Section 41.1–6 [§ 41–8.3 of the Code of 1950] was originally enacted in 1966 for the purpose of ratifying grants issued by the State Librarian (successor to the Register of the Land Office) pursuant to Section 41.1–3 [§ 41–8 of the Code of 1950]. Section 41.1–3 carries the proviso that "this section shall not be construed to affect the title to grants issued prior to March fifteen, nine-

teen hundred thirty-two." Under this statutory scheme grants issued in accordance with Section 41.1–3 are ratified, but expressly excluded from the operation of Section 41.1–3 are grants issued prior to 1932. The retroactivity provisions of Section 41.1–6, therefore, do not apply to the Powell grant of 1901.

## II

The law of trespass to real property in Virginia is governed by the general principle that "every person is entitled to the exclusive and peaceful enjoyment of his own land, and to redress if such enjoyment shall be wrongfully interrupted by another." *Tate v. Ogg,* 170 Va. 95, 195 S.E. 496, 498 (1938). Thus, every unauthorized entry upon the real property of another without legal authority resulting in some damage, however minuscule, constitutes a trespass. *See generally* 18 Michie's Jurisprudence, Trespass, § 2 (1974 Repl.Vol.). To maintain an action of trespass in Virginia, "there must have been possession—either actual or constructive—in the plaintiff when the trespass was committed." *Blackford v. Rogers,* 2 Va.Dec. 292, 23 S.E. 896, 897 (1896). The burden, therefore, is upon the Conservancy to prove by a preponderance of the evidence the identity and location of the land which it claims and to show that it has legal title to the land in controversy. *W. M. Ritter Lumber Co. v. Edwards,* 171 Va. 185, 198 S.E. 433, 434 (1938).

The Club has admitted use of certain portions of Hog Island outside the perimeters of a 5.4 acre parcel to which the Conservancy seeks to limit the Club. As a matter of law, the use of the beach access road and the marshes and meadow land of Hog Island is not an act of trespass. On the other hand, travel on the Atlantic beach belonging to the Conservancy and the portion of the north-south road bisecting the Conservancy's lands constitutes unauthorized use of the Conservancy's property. In addition, the Conservancy has set forth a number of incidents which allegedly are acts of trespass:

1. Damage to a black skimmer nesting colony and to the nesting areas of other birds.
2. Vehicular use in the dune area of the Conservancy's land.
3. Human travel in a shrub thicket located on the Conservancy's property.
4. Hunting and the leaving of litter on the Conservancy's property.

None of these enumerated incidents of alleged trespass have been proven as acts of the Club. Members, guests and employees have been observed on the Atlantic beach and the beach access road. There is testimony of indiscriminate use of vehicles over the Conservancy's property, of litter, baiting, and damage to subterranean fauna, sand dunes, and wildlife. All the activities testified to may be harmful to the ecology of Hog Island and lessen the Conservancy's enjoyment of its property; however, there is no direct evidence of the involvement of any of the Club's employees, guests, agents or members in the described activities. The circumstantial evidence tending to show the responsibility of the Club is weakened by the fact that the island's beaches, marshes and inland spaces are used by other landowners on Hog Island and by the public for many of the same activities engaged in by the Club's members and guests.[8] Based upon this background of use of Hog Island and the evidence presented by the Conservancy, there is insufficient proof to establish acts of trespass beyond the use of the north-south road and the beaches. Consequently, the issue of monetary relief for damages to the ecology of Hog Island need not be considered except as it pertains to the use of the north-south road and the Atlantic beach between mean low water and mean high water.

## III

The use of the north-south road and the Atlantic beach by the Club's mem-

---

**8.** There is uncontradicted evidence that visitors to the island or other landowners have brought vehicles to Hog Island by use of barges, landed airplanes on the Atlantic beach and docked boats at the Club's pier without prior permission.

bers, guests, employees and agents has not been shown to have caused damage to the Conservancy's property. Again, the Conservancy has not met the burden of proving either by direct or circumstantial evidence that the Club is responsible for the damage the Conservancy claims. The Conservancy is, therefore, limited to a recovery of nominal damages. See *McClannan v. Chaplain,* 136 Va. 1, 116 S.E. 495 (1923).

The Club opposes a grant of injunctive relief to the Conservancy on several grounds, stating that the injunctive relief is barred by either the doctrine of clean hands, the doctrine of laches, or the failure of the Conservancy to show a clear or unquestioned right or title in its property. All of the theories advanced by the Club to bar injunctive relief are not supported by the evidence in this case.

The Club asserts the doctrine of laches based on the Conservancy's acquisition of its Hog Island property in December 1970, and the failure to bring suit until October 1974. Even if the Conservancy had knowledge of the controversy in 1970, the Conservancy had no duty to promptly enter suit. The meritorious allegations of trespass in this case concern activities of the Club which it pursued under a claim of right. Furthermore, the infrequent use of the island by the Club's members, its isolation and the lack of opportunity by the Conservancy's employees to make day-to-day observations all indicate that a four-year interval between purchase and filing suit is not unreasonable.

The Club seeks to show a lack of "clean hands" in the Conservancy because of instances in which agents of the Conservancy have come upon the Club's land without prior permission. Invocation of the doctrine of clean hands will not be applied where an inequitable result would follow or where the parties would have to resort to further litigation. *Harrell v. Allen,* 183 Va. 722, 33 S.E.2d 222, 226 (1945). The circumstances of this case require determination of the issues including granting of appropriate relief. The doctrine of clean hands should not be applied to deny a full resolution of the issues.

The Conservancy has proved, by a preponderance of the evidence, acts of trespass by the Club on land owned by the Conservancy on Hog Island in the County of Northampton, Virginia. An Order will be entered awarding the Conservancy damages in the amount of ten (10) dollars and barring the Club, its members, guests, agents and employees from the use of the north-south road throughout the Conservancy's tract and the Atlantic beach on lands of the Conservancy, the title of which was derived from Powell, without the permission of the Conservancy, and establishing the right of the Club to travel on the beach access road and utilize the marshes and meadow land of Hog Island. The Club having admitted to the Court that there was no merit to its Counter-Claim, the Counter-Claim is dismissed with prejudice. The Conservancy shall prepare and submit an appropriate Order within ten (10) days.