571 F.2d 1294
 The NATURE CONSERVANCY, Appellee,
v.
MACHIPONGO CLUB, INC., a West Virginia Corporation, Appellant.
The NATURE CONSERVANCY, Appellant,
v.
MACHIPONGO CLUB, INC., a West Virginia Corporation, Appellee.
 Nos. 76-2086 and 76-2087.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 6, 1977.
Decided March 2, 1978.
 
 Allan Gates, Washington, D. C. (Timothy B. Atkeson, Washington, D. C., Hardy Wieting, Jr., Arlington, Va., on brief), for appellee in No. 76-2086 and for appellant in No. 76-2087.
 Herbert H. Bateman, Newport News, Va. (William W. Talbot, Webster Springs, W. Va., on brief), for appellant in No. 76-2086 and for appellee in No. 76-2087.
 Anthony F. Troy, Atty. Gen. of Virginia, and James E. Moore, Asst. Atty. Gen, Richmond, Va., on brief, for amicus curiae Commonwealth of Virginia.
 Before WINTER and RUSSELL, Circuit Judges, and FIELD, Senior Circuit Judge.
 WINTER, Circuit Judge:
 
 
 1
 This diversity action presents questions of the respective property interests of plaintiff, The Nature Conservancy (Conservancy), and defendant, Machipongo Club, Inc. (Machipongo), in and to Hog Island, a barrier island lying off the Atlantic Coast of Virginia's eastern shore. Conservancy acquired title to substantially all of the land on the northern end of the island by purchase from Edward O'Neil, II, and George Potter O'Neil, except for a 5.4 acre site owned by Machipongo. Machipongo had acquired title to its property by quit claim deed from the United States, which had been given the site by the O'Neils in 1935 for the erection and maintenance of a Coast Guard station. At issue are the ownership and right to use the marsh, meadowland and beaches of Hog Island, as well as certain roads or trails located on the island. All of these contested areas lie outside the site described in the deed from the United States to Machipongo.
 
 
 2
 In its opinion in Nature Conservancy v. Machipongo Club, Inc., 419 F.Supp. 390 (E.D.Va.1976), the district court sustained some of Conservancy's asserted property rights but denied others. It held that the North-South road was not a public road and therefore Conservancy could prohibit use of it. It held also that Conservancy could prohibit travel on the Atlantic beach not within the confines of Machipongo's property. With respect to the so-called beach access road, however, it held that a 780' right-of-way from the 5.4 acre site had been established by a previous grant from the O'Neils to the Coast Guard, that the United States had conveyed this interest to Machipongo, and that the United States had also transferred to Machipongo a prescriptive easement from the right-of-way to the beach. Finally, it held that Conservancy's predecessors in title had not acquired title to the marshes and meadowlands where they had been used in common for fishing and fowling and therefore Conservancy could not prohibit the use of them by the public.
 
 
 3
 Except with respect to the beach access road, we agree with the district court's disposition of the case for the reasons assigned in its opinion. With regard to the beach access road, we conclude that the Coast Guard was not granted a 780' right-of-way and that it did not acquire a prescriptive easement. We affirm in part and reverse in part.
 
 I.
 
 4
 The facts, both generally and with respect to the beach access road, were fully found by the district court. We will state the pertinent ones only succinctly and we will avoid unnecessary repetition.
 
 
 5
 The deed from the O'Neils to the Coast Guard in 1935 was preceded by an exchange of correspondence between the parties. The Coast Guard initiated the exchange by a letter asking for the donation of one acre of marshland for a Coast Guard station site. The O'Neils responded and stated their willingness to make the donation, but they asked the Coast Guard to describe "more accurately . . . where you desire the land." In due course the Coast Guard sent a sketch showing the location of the land and almost a month later furnished a metes and bounds description. The description indicated that the quantity of land to be donated was increased to 5.4 acres and included a 50' wide strip right-of-way from the described parcel to what was termed the higher beach, a distance of about 780'. The O'Neils replied to this letter by telegram indicating their willingness to grant the described property.
 
 
 6
 For some reason or reasons which the record does not reflect, the deed from the O'Neils to the Coast Guard set forth the metes and bounds description of the 5.4 acres but it omitted the description of the 50' wide, 780' long right-of-way from the described parcel to the higher beach. The deed did include, following the metes and bounds description, this language:
 
 
 7
 (A)ll of which is shown on a map, attached hereto, by United States Coast Guard, Civil Engineers' Office, Washington, D.C. No. 101,166, dated 10/11/35.
 
 
 8
 The map was a single sheet containing three sub-maps of differing scale. One depicted the general vicinity of Hog Island, another depicted the north end of Hog Island and the location of the proposed site, and the third depicted the metes and bounds description of the proposed site. Two of the sub-maps showed no indication of any right-of-way or beach access road; however, the one depicting the metes and bounds description included two parallel lines running from the eastern edge of the parcel labelled "Location 50' Right-of-Way about 780' to Higher Beach."
 
 
 9
 It is not disputed that the Coast Guard used the 780' right-of-way from the time that the station was built, approximately 1936, until it was abandoned in 1964, and also that as the land mass on the north end of Hog Island grew through accretion, the Coast Guard regularly used an even longer right-of-way.* The record indicates that the O'Neils knew about the Coast Guard's use of the right-of-way as extended, yet they never sought to prohibit its use. The O'Neils' understanding concerning the nature of this use may explain their silence. From the descriptive language furnished to him by the Coast Guard but not actually included in the deed, and from his knowledge of the operations of the Coast Guard and the topography, Edward O'Neil, II, surmised that the Coast Guard would use the right-of-way as extended in order to launch life boats from the high beach in stormy weather, when launching them from the actual Coast Guard site, which was marshy land, would be impossible. With this knowledge, he acquiesced in the use. Indeed, he and his brother evidenced a pattern of complete cooperation with the Coast Guard over the years. They gave several specific licenses to the Coast Guard to install helicopter pads during World War II, to use a right-of-way to gain access to the back of the Coast Guard station since it was inadvertently built on the edge of the Coast Guard property, and to dump dredged material.
 
 
 10
 With respect to the 780' of beach access road, the district court ruled as a matter of law, on the authority of Bossieux v. Shapiro, 154 Va. 255, 153 S.E. 667 (1930), that the depiction of a 780' right-of-way on one of the three sub-maps attached to the 1935 deed constituted a grant of that right-of-way, and that the Coast Guard had obtained a prescriptive easement for the entire length of the right-of-way approximately 3,168' as of 1968 and approximately 3,800' as of 1973.
 
 II.
 
 11
 We disagree with the district court that the deed from the O'Neils to the Coast Guard conveyed the 780' right-of-way. Imprimis, the language describing the right-of-way was omitted from the deed. In the absence of evidence to demonstrate an inadvertent omission, we would infer that the parties intended the consequences of their acts. It therefore follows that the omission was intentional and that the parties did not intend to convey the right-of-way.
 
 
 12
 It is true that the deed contained the reference to the attached map that we have quoted and that a sub-map on that document depicts the right-of-way. But the sub-maps depict more. They show also land owned by the O'Neils, as well as water not owned by the O'Neils, and other islands which were clearly never intended to be conveyed. Therefore, we cannot say that the mere appearance of a right-of-way on one of the three sub-maps operated as a conveyance of that right-of-way.
 
 
 13
 Bossieux, relied on by the district court, does not require a different conclusion. That case concerned a boundary wall which was part and parcel of land described as "bounded according to a survey . . . hereto attached and made a part of this deed, as follows. . . ." There followed a metes and bounds description indicating that the wall in question was the boundary wall of an adjoining property. The survey, however, indicated that the boundary of the property ran down the middle of a double wall. When the purchasers sought to open the wall, it was found to be a single wall and they sued for damages for breach of the covenant of warranty on the theory that the seller had conveyed them half of a double wall as disclosed on the survey. This claim was sustained because:
 
 
 14
 When a grantor, in a deed makes a survey or plat a part of his deed, it makes no difference who made the plat or who the surveyor was acting for in making it, the grantor, by incorporating the plat in his deed, accepts and adopts it as his own, and thereafter it will be treated as his own, and it is binding on him. 153 S.E. at 668.
 
 
 15
 In Bossieux, the seller purported to convey all of the property depicted on the survey; the O'Neil deed purported to convey only the 5.4 acre parcel. Particularly is the latter true since the parties, before the conveyance, considered a description which included the right-of-way but for undisclosed reasons employed a description which omitted it. The rule of Bossieux is but a rule of construction to be used as a guide in resolving questions concerning the parties' intent. The determinative issue is always the parties' intent. Conner v. Hendrix, 194 Va. 17, 72 S.E.2d 259 (1952). Where, as here, there are facts to disprove the intent which the rule of construction of Bossieux would supply, the parties' real intent must prevail.
 
 
 16
 We also disagree that the Coast Guard obtained a prescriptive easement to all or any part of the beach access road. The Virginia law on prescriptive easement is best explained in Eagle Lodge v. Hofmeyer, 193 Va. 864, 71 S.E.2d 195 (1952). In it various principles of law established by earlier Virginia cases are restated. First, the law does not lightly presume the existence of a prescriptive easement and the burden is on a party claiming one to prove its elements clearly. Second, to ripen into a prescriptive right, the claim to the use must be adverse, i. e., not accorded as a mere accommodation but asserted under a claim of right hostile to the rights of the owner of the servient estate, and it must continue for the prescriptive period. Where the landholder permits the use of his land, either expressly or implicitly, a prescriptive easement can never arise.
 
 
 17
 The use here continued for the prescriptive period, but we do not think that an adverse use has been clearly proved. Initially the O'Neils gave the site for a lifeboat station. They welcomed the Coast Guard and consistently permitted it to use their land in connection with its undertakings. Thus, it is hardly surprising that they lodged no objection to the use of the beach access road. The inference that the use was permissive is especially strong here because Edward O'Neil, II, knew from the topography of the site that lifeboats could not be launched from the site when they would most be needed. Aside from a possible inference to be drawn from the fact of continued use, there is no evidence that the Coast Guard claimed any right to use the road. Indeed, when the government invited bids for the purchase of the property, after the Coast Guard abandoned it, the government advertised the sale of the 5.4 acre site but made no mention of any right-of-way. We think that the weight of the evidence requires the conclusion that the Coast Guard had a license, express or implied, to use the beach access road but that it did not acquire a prescriptive easement.
 
 
 18
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 
 *
 Although it is not clear whether the original 780' right-of-way ever reached the seashore, the actual use extended that far