## WALKER *v.* HENSHAW.

Prior to the 9th of July, 1858, when the President set apart the surplus of land which remained after the Shawnee Indians had obtained their complement under the treaty of the United States with them, ratified November 2d, 1854, and opened such surplus to pre-emption and settlement, an Indian of the Wyandotte tribe could not locate "a float" held by him under the treaties of the United States made with his tribe October 5th, 1842, and 1st of March, 1855.

ERROR to the Supreme Court of Kansas; the case being thus:

Walker and others brought an action under the civil code of Kansas to try title to and get possession of a section of land in Douglas County, Kansas, being "parcel of the lands ceded to the United States by the Shawnee tribe of Indians, by treaty ratified November 2d, 1854,* and lying between the Missouri State line and a line parallel thereto and west of the same thirty miles distant."

The condition of these lands, as gathered from the provisions of certain Indian treaties and the laws of Congress, was as follows:

---

* 10 Stat. at Large, 1056.

By articles of convention, made between William Clark, Superintendent of Indian Affairs, and the *Shawnees*, of November 7th, 1825, in exchange for their lands near Cape Girardeau, on the Mississippi, held under the authority of the Spanish government, the Shawnees had the right to select 1,600,000 acres of land (a tract equal to fifty miles square) on the Kansas River, to be "laid off either south or north of that river, and west of the boundary of Missouri."

By act of Congress of May 28th, 1830, the President was authorized to make the exchange,* and—

§ 3. "To assure the tribe or nation . . . . that the United States will forever secure and guarantee to them, their heirs or successors, the country so exchanged with them," and

§ 6. "To cause such tribe or nation to be protected, at their new residence, against all interruption or disturbance *from any other tribe or nation of Indians,* or from any other person or persons whatsoever."

By articles of agreement and convention of August 8th, 1831, the United States agreed to grant, by patent in fee simple, 100,000 acres of land, to be located under direction of the President, within the limits of the fifty miles square reserve, provided for by the said treaty of 1825,† and to guarantee that said lands

"Shall never be within the bounds of any State or Territory, . . . and cause said tribe to be protected . . . against all interruption or disturbance *from any other tribe or nation of Indians,* or from any other person or persons whatever."‡

[This fifty miles square reserve was located so as to include the lands in question.]

These arrangements and this treaty, the reader will observe, were with the *Shawnee* Indians; and thus things with that tribe and the United States remained A.D. 1842.

On the 17th of March in the year just named, a treaty was concluded between the *Wyandot* Indians and the United States.§  The 14th article of it was thus:

---

* 4 Stat. at Large, 412, § 2.  † 7 Id. 356, art. 2.
‡ 7 Id. 357, art. 10.  § 11 Id. 583.

" The United States *agree to grant,* by patent in fee simple, to each of the following named persons [Irwin Long among others] and their heirs, all of whom are Wyandottes, one section of land, . . . out of any lands west of the Mississippi [afterwards changed by amendment to Missouri] River, *set apart* for Indian use, *not already claimed or occupied by any person or tribe.* The lands hereby granted to be selected by the *grantees,* . . . *but never to be conveyed* by them, or their heirs, without the permission of the President of the United States."

We now come back to the *Shawnees.*

The 1,600,000 acres of land granted to them by the treaty of 1825, subject to the provisions of the treaty of August 8th, 1831, including the lands in question, remained the property of the Shawnees until November 2d, 1854.* A new treaty was then ratified between them and the United States, by which the Shawnees ceded to the United States this 1,600,000 acres, and the United States ceded back to the Shawnees 200,000 thereof, " to be selected between the Missouri State line and a line parallel thereto, and west of the same thirty miles distant," *including the lands in question.*

Out of these 200,000 acres, east of the thirty mile line, were to be carved certain head rights, and set off certain tracts to be occupied by Shawnees in common and for the protection of certain absentees; the residue was to be

" Set apart in one body of land, in compact form, under the direction of the President of the United States, and all such Shawnees as return to and unite with the tribe within FIVE years from the proclamation of this treaty† shall be entitled to the same quantity of land " as their brethren, &c., . . . . " and whatever portion of said surplus remains unassigned, *after the expiration of said five years,* shall be sold as hereinafter provided," &c., the selections to conform to the legal subdivisions of the survey provided for in article 5.

The fifth article also

" No *white person or citizen* shall be permitted to *make locations or settlements* within the thirty mile limits until after all of the

---

*. 10 Stat. at Large, 1053.          † This gave until November 2d, 1859.

lands shall have been *surveyed,* and the Shawnees shall have made their selections and locations, *and the President shall have set apart the surplus.*"

On the 22d of July, 1854, Congress passed an act extending the pre-emption laws over "all the lands to which the Indian title has been, or shall be, extinguished" within the Territories of Nebraska and Kansas.*

We now pass back again to the Wyandottes, with whom the treaty had been made October 5th, 1842.

By a new treaty, now made March 1st, 1855, it was thus provided in a tenth article:

"That each of the individuals to whom reservations were granted by the fourteenth article of the treaty of March 17th, 1842, or their heirs or legal representatives, shall be permitted to *select* and *locate* said reservations on any *government* lands west of the States of Missouri and Iowa, *subject to pre-emption and settlement,* said reservations to be patented by the United States in the name of the reservees as soon as practicable after the selections are made; and the reservees, their heirs or *proper representatives,* shall have the unrestricted right to sell and convey the same whenever they may think proper."

*The lands in question were first opened for settlement, pre-emption, and sale on the 9th of July,* 1858.

So far as to treaties and the date of opening of these lands to pre-emption, &c. Now as to the facts of this particular case.

The plaintiffs claimed under Irwin Long, the Wyandotte Indian mentioned in the treaty of 1842, who held a patent from the United States. In support of this title it appeared that on the 8th of May, 1857, one Stover, a white man, as agent for Long, filed in the office of the Surveyor-General of Kansas and Nebraska a written notice that as such agent of Long he had on that day selected and located a reserve of land to which Long was entitled, *in pursuance of the two treaties made by the United States with the Wyandottes on the 5th of October,* 1842, *and the 1st of March,* 1855. On this pro-

---

* 10 Stat. at Large, 309.

ceeding a patent—this being the patent under which the plaintiffs claimed—purporting to convey the lands in pursuance of the said treaties, was issued and duly delivered.

The defendants claimed title by virtue of a pre-emption settlement of the 28th of July, 1858. In support of this title it appeared that in February, 1857, one Whaley, being personally qualified, entered upon and made settlement in person, and commenced to improve with intent to pre-empt and purchase the land; that after making such settlement, and within thirty days thereafter, he went to the proper local land office, with intent to file notice of his said settlement and intention to pre-empt, and offered to make such filing; but that the register of the land office refused to allow such filing, on the ground that the said land was not pre-emptable; that in April of the same year he went to the same office and made the same offer, which was refused by the register on the same grounds; that on the 30th day of July, 1858, he duly filed in the office of the register of the said land office a notice of his settlement on said land, and of his intention to pre-empt the same, dating the time of his settlement July 28th, 1858; *that on the 5th day of May, 1859,* he purchased the said land, and paid for the same, and took the usual certificate of such purchase and payment; that on the 10th day of August, 1860, the said pre-emption and purchase was approved by the Commissioner of the General Land Office of the United States, and the register of the local land office was duly notified, by letter of said commissioner, of such approval.

That afterward the said Whaley applied to the register of said local land office, at his office, for a patent from the United States to him for said land, and was informed by said register that said patent had been sent from Washington to said office, and afterwards recalled.

As already said, the land in question was first opened for settlement, pre-emption, and sale, on the 9th of July, 1858.

The suit being referred to a referee to try the action, he found as matter of law that up to the 9th of July, 1858, when, as just mentioned, the lands were first opened for settlement,

pre-emption, and sale, and indeed up to May 5th, 1859, when Whaley made his payment and purchase, neither plaintiffs nor defendants had acquired any title; but that by the purchase and payment then made, an equitable title was vested in Whaley.

He accordingly found that the defendants were entitled to judgment, and found further that the plaintiffs should convey the title to the defendants, &c.

This decision was declared to be right by the Supreme Court of the State, and the case was now brought here for review.

*Messrs. W. T. Otto and J. P. Usher, for the plaintiffs in error; Messrs. Thacher and Banks, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

If the land in controversy was subject to the location of the Wyandotte float before it was proclaimed open to pre-emption and settlement, the title of the plaintiffs cannot be divested by any supposed equity growing out of the pre-emption of the defendants. If, on the contrary, neither the plaintiffs' grantor nor the defendants could take any steps towards acquiring title to the land until the 9th day of July, 1858, when it was first opened to pre-emption settlement, the defendants having since that date complied with all the requirements of the pre-emption law, and obtained the usual certificates of purchase, and the grantor of the plaintiffs having taken no action on the subject after the 8th day of May, 1857, are equitably entitled to the land, and the legal title enures to their benefit.

Whether the one or the other of these categories be true, depends on the construction to be given several Indian treaties, which we will proceed to notice.

By the fourteenth article of the treaty with the Wyandotte nation of Indians, ratified on the 5th day of October, 1842,* the United States agreed to grant to each of several named

---

* 11 Stat. at Large, 583.

persons (among the number Irwin Long), Wyandottes by blood or adoption, a section of land out of any lands west of the Missouri River, set apart for Indian use, not already claimed or occupied by any person or tribe. The privilege of selecting the lands was conceded to the grantees, but the power of alienation was denied them, except with the permission of the President.

Another treaty was made with this same tribe of Indians on the first day of March, 1855,* which conferred on the reservees, under the treaty of 1842, the right to select and locate their lands on any government lands west of the States of Missouri and Iowa, subject to pre-emption and settlement, and the restriction upon alienation imposed in the first treaty was withdrawn, except as to certain incompetent persons. The reserve of Long, through whom the plaintiffs claim title, was located upon the land in dispute, in May, 1857, and the question is, was the location authorized by either of these treaties? It is contended that the lands were not, at the time of the attempted location, subject to be taken under the Long float, because they were then claimed or occupied by the Shawnee Indians, and this presents the most important subject of inquiry.

It had been, for a long time prior to the Wyandotte treaty of 1842, the well-defined policy of. Congress to remove the Indians from organized States, and in execution of this policy, territory supposed at the time to be too remote for white settlement, was set apart exclusively for the use of Indian tribes. It was this policy that dictated the removal of the Shawnees from Missouri and Ohio, in 1825 and 1831, to a tract of country in Kansas of large area, ceded to them by the United States, and embracing the lands in controversy. They held this large tract of land under the protection of treaties and acts of Congress, from 1825 to 1854, when the rapid decrease in their numbers, and the encroachments of the white population, induced the government to conclude another treaty with them, essentially lessening

---

* 10 Stat. at Large, 1162.

their territorial limits. During this time they were, by express stipulation, assured of protection, not only against interruption or disturbance from any other tribe of Indians, but from everybody else. In recognition of this guarantee, the reservees, under the Wyandotte treaty of 1842, although in pursuance of the policy of the government, confined in their selections to lands west of the Missouri River set apart for Indian use, could not appropriate the lands already claimed or occupied by any person or tribe.

It is apparent, therefore, that Long had no right to locate his float on the land in dispute, from 1842 to 1854, because during all this time it was claimed or occupied by the Shawnees. Did the treaty of 1854 with them so alter the condition of things as to render valid the location of this float in 1857? By this treaty the Shawnee nation ceded to the United States all the large domain granted to them by the treaty of 1825, with the exception of two hundred thousand acres reserved as homes for the Shawnee people, to be selected within certain defined limits, which included the lands in dispute. It was contemplated that even this reservation might be more than the wants of this people required, on account of the paucity of their numbers and the limited quantity of land assigned to each individual member of the tribe. Accordingly, provision was made that the surplus which remained unassigned after the expiration of five years, unless sooner ascertained, should be sold by the government and the proceeds appropriated to the use of the Indians. During this time the privilege was conceded to the Shawnees of selecting their lands wherever they chose, within the limits of the reservation. Indeed, until this privilege was exhausted, the land, in any proper sense, belonged to them.

In surrendering the larger part of their immense possessions to relieve the government from the predicament in which it was placed by the advancing tide of white population, they did not part with any right in the lesser part reserved by them as long as the claim of any single member of the tribe, according to the terms of the treaty, was unsatisfied. If one person could acquire a right to any portion

of the lands thus reserved so could another, and in this way the privilege of free and unrestricted selection would be frittered away. It needed no special provision to secure this freedom of choice, for without it the treaty could not be executed. By virtue of the treaty itself these lands were appropriated to a specific purpose, and whatever interfered with the accomplishment of this purpose was necessarily forbidden.

It is easy to see that the purpose for which the Shawnees retained in their own hands the entire reservation could not be effected, if an entry for location and settlement by any one else were permitted, for the part thus taken was subject at any moment of time to be chosen for the use and occupation of the Shawnees. In effect the retrocession by these Indians of the lands granted to them in 1825 was on the condition that they should be allowed to select, within a limited time, out of two hundred thousand acres set apart for this purpose, a quantity of land equal to two hundred acres for each individual member of the tribe. The performance of this condition required, until this time expired, absolute non-interference by any outside party. On any other theory of interpretation these Indians, on account of their helpless state, could not have obtained the lands they desired. If these views be correct the exclusion, in section five, of white persons and citizens from making locations or settlements was not required by the necessities of the case. They were excluded without it. The clause was doubtless inserted out of superabundant caution and to satisfy the misgivings of the Indians, who, from experience, had good reason to dread the encroachments of this class of people, notwithstanding treaty stipulations. This experience had given them no ground to apprehend interference from the Indians on account of the direct control exercised by the government over the affairs of all the Indian tribes.

If, however, the government had been able, without difficulty, to protect them against their own race, it had not, with every effort, been always able to hold in restraint the ceaseless activity of the white race. It was therefore natural

that on this occasion the Shawnees should want, although
wholly unnecessary, a positive stipulation against the un-
lawful intrusion upon their rights by our own citizens.   In-
deed, this very case affords an illustration of the quarter
from which trouble has always arisen, for Stover, a white
man located the reserve, and it is a reasonable presumption,
in the absence of any proof on the subject, that he was in-
terested in the location.   It is enough to say, without pur-
suing this branch of the case further, that we agree with the
learned Supreme Court of Kansas, that the latter clause of
the fifth article of the treaty "conferred no right or made
no prohibition which the law would not raise on the treaty"
without it.

If so, the location of Long's float, under the treaty of
1842, was an illegal act, because inconsistent with the exist-
ing rights of the Shawnees.   These rights were in full force
at the time of the attempted location, and remained in this
condition until the proclamation of the President of the 9th
of July, 1858, setting apart the surplus of lands which re-
mained after the Shawnees had obtained their full comple-
ment and opening the lands thus segregated for pre-emption
and settlement.

In no respect has the United States failed to discharge
the obligation incurred by the treaty of 1842 with the Wyan-
dotte reservees.   The Indian country to which they were
invited to go had been defined by Congress,* and they were
told to locate their reserves anywhere within it, provided
they did not encroach on the rights of others.   This limita-
tion was not only reasonable in itself, but essential to pre-
serve the faith of the government in its several treaties with
the different Indian tribes.   Why thirteen years were suf-
fered to pass without these reserves being located does not
appear, but it is obvious in 1855 they had materially lessened
in value, as before that time the limits of the Indian country,
by legislation and treaty, had been very much restricted.
This restriction imposed on the government the duty of

---

* See 4 Stat. at Large, 729, and acts extending the same.

making other provisions for these floating grants, and this duty was performed by the Wyandotte treaty of 1855. This treaty, among other things, allowed the reservees to locate their floats on any government lands west of Missouri and Iowa subject to pre-emption and settlement, and removed the restraint upon the power of alienation, imposed in the former treaty. This action of the government placed Long and the defendants, as to the lands in question, on precisely the same grounds. Neither party could acquire any right to them until they were thrown open to pre-emption and settlement, and both, as soon as this was done, were at liberty to take them up; Long, by means of his float, the defendants by reason of their qualifications as pre-emptors; and whoever moved in the matter first would have the better right. It required, however, positive affirmative action after the lands were declared to be public lands before any title to them, legal or equitable, could be obtained, and all proceedings attempting to forestall the proclamation of the President were null and void, because in contravention of the treaty with the Shawnees. The defendants, not relying on their prior settlement in February, 1857, to protect them, took the proper steps after this proclamation to perfect their pre-emption, and have performed all the conditions to which they were subject by the law. They have therefore a complete equitable title to the land, and as the patent issued to Long was based on an unlawful entry it ought to be transferred to the defendants.

There is, in our opinion, no error in the judgment of the Supreme Court of Kansas, and it is accordingly

AFFIRMED.