## UNION PACIFIC RAILROAD COMPANY *v.* HARRIS.

ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 19. Argued November 2, 1909.—Decided January 3, 1910.

The words "public lands" in legislation refer to such lands as are subject to sale or other disposal under general laws, and no other meaning will be attributed to them unless apparent from the context of or circumstances attending the legislation.

While the power of Congress continues over lands sought to be acquired under preëmption and homestead laws until final payment, an entryman in actual possession cannot be dispossessed of his priority at the instance of an individual.

While a grant of right of way may take effect as of the date of the grant that date must be found in the act prescribing the finally adopted route.

In this case the rights of a *bona fide* settler holding a patent under preëmption law and his grantee *held* superior to those of the railroad company under the act of July 1, 1862, 12 Stat. 489, 494, granting public lands for a railway right of way.

76 Kansas, 255, affirmed.

THE admitted facts are that on April 22, 1861, Bernhard Blou settled upon and improved the northeast quarter of section 12, township 14 south, of range 3, in Saline County, Kansas, and on May 13, 1861, filed the declaratory statement required by the preëmption laws. Blou, by occupation, cultivation and improvements, preserved all his rights under the preëmption until September 5, 1865, when, having made no payment or final proof, he changed his preëmption entry to one under the homestead act of May 20, 1862. He continued in occupation, on December 8, 1870 made final proof under his homestead entry, and, on March 15, 1872 received a patent.

By the act of July 1, 1862, the general Union Pacific Railroad act, 12 Stat. 489, 493, c. 120, the Leavenworth, Pawnee and Western Railroad Company, whose name was changed to the Union Pacific Railroad Company, Eastern Division,

and thereafter to the Kansas Pacific Railway Company, was granted a right of way 200 feet in width on each side of its road, through the public lands of the United States. The plaintiff in error, hereinafter called the defendant, has succeeded to the right, title and interest of the Leavenworth company. The route of the company as prescribed by the act ran from Missouri up the Kaw River until it reached the Republican River, and then north along the left bank of that river to intersect with the one hundredth meridian in the Territory of Nebraska. On July 17, 1862, the company filed its map of general route, and caused the lands within the limits of fifteen miles thereof on either side of the proposed route to be withdrawn from sale. Under the amendatory act of July 2, 1864, 13 Stat. 356, c. 216, the company filed another map, designating the same general route. Neither of these routes came within forty-five miles of the tract in controversy. Among the changes in the last-named act is one providing in § 3 for the condemnation of a right of way 200 feet wide through land occupied by the owner or claimant. The act of July 3, 1866, 14 Stat. 79, c. 159, changed the route to extend westwardly towards Denver. Under this act the company located and constructed its road westwardly along the Smoky Hill River instead of northwestwardly along the Republican River, and, as located and constructed, the road passed through the quarter-section which Blou was then seeking to acquire under the homestead law.

On January 20, 1873, Bernhard Blou executed and delivered to the Kansas Pacific Railway Company, the successor of the Leavenworth, Pawnee and Western Railroad Company, a deed for a right of way through said quarter-section, which deed the railway company accepted and paid him the consideration named in it. The land in controversy is a strip 150 feet wide, lying immediately south of a line fifty feet south of the center of the track of the defendant through the quarter-section. On November 10, 1882, Blou sold and conveyed to John Erickson by warranty deed all that part of the

quarter-section lying south of the railroad track, containing 101 acres. The defendants in error, hereinafter called the plaintiffs, derive title from Erickson. The plaintiffs and those under whom they claim had exclusive possession of the land in question from May, 1861, to August, 1902; broke and cultivated it, and paid all taxes assessed upon it since the issue of the patent. In August, 1902, the defendant fenced and took possession of the tract in controversy, whereupon this action to recover possession was commenced by the plaintiffs. The court found in their favor, and rendered judgment accordingly. This judgment was affirmed by the Supreme Court of the State (*Union Pacific R. R.* v. *Harris,* 76 Kansas, 255), and thereupon the case was brought here on error.

*Mr. Maxwell Evarts,* with whom *Mr. R. W. Blair* was on the brief, for plaintiff in error.

*Mr. T. F. Garver* and *Mr. L. C. Milliken* for defendant in error, submitted.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

The grant of the right of way was "through the public lands." What is meant by 'public lands' is well settled. As stated in *Newhall* v. *Sanger,* 92 U. S. 761, 763: "The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws." See also *Barker* v. *Harvey,* 181 U. S. 481, 490; *Minnesota* v. *Hitchcock,* 185 U. S. 373, 391. If it is claimed in any given case that they are used in a different meaning, it should be apparent either from the context or from the circumstances attending the legislation. While the power of Congress over lands which an individual is seeking to acquire under either the preëmption or the homestead law remains until by the payment of the full purchase price required by the former law or the full occupation prescribed by the lat-

ter, yet under the general land laws of the United States one who, having made an entry, is in actual occupation under the preëmption or homestead law cannot be dispossessed of his priority at the instance of any individual. *Hastings &c. Railroad Co.* v. *Whitney*, 132 U. S. 357, 363, 364. In other words, one who has taken land under the preëmption or homestead law acquires an equity of which he cannot be deprived by any individual under the like laws. Now at the time of the passage of the act of July 3, 1866, Blou was and had been for several months in actual occupation under the homestead law. Did Congress intend by its legislation to deprive him of that equity which he had under the general land laws as against any one proceeding under those laws?

Any possible rights of the railroad company in this land commence with the act of July 3, 1866, for while the acts of 1864 and 1866 were in amendment of the act of 1862, yet the route prescribed by the acts of 1862 and 1864 was far to the east of this land, and only by the act of 1866 was the company authorized to construct a road through or near it. True, as held in *Railroad Company* v. *Baldwin*, 103 U. S. 426; *Bybee* v. *Oregon & California Railroad Company*, 139 U. S. 663, 679; *Northern Pacific Railway Company* v. *Hasse*, 197 U. S. 9, 10, the grant of the right of way is absolute, and takes effect as of the date of the grant. But that date must be found in an act prescribing the finally adopted route.

A case much relied upon by the railroad company, as showing the intent of Congress in its grant of the right of way to the Union Pacific Railroad Company and its tributaries, is *Union Pacific Ry. Company* v. *Douglas County,* 31 Fed. Rep. 540. In it it was held:

"It was the evident intention of Congress by the act of July 1, 1862, 12 Stat. 491, giving a right of way to the Union Pacific Railroad Company, to grant such right of way through those lands which by surveys should be found to be sections 16 and 36, the school sections which it intended to give to the future State of Nebraska, pursuant to the provisions of the

organic act of 1854, 10 Stat, 283, creating the Territory of Nebraska."

In other words, it was held that although Congress had in 1854 created the Territory of Nebraska, with the provision that when the lands within it were surveyed sections 16 and 36 in each township should be reserved for school purposes, it meant by the act of 1862 to grant a right of way to the railroad company through lands which should thereafter be found to be those sections. But that decision does not reach to the precise question here presented, and many of the reasons which led to it are inapplicable here. It was well known that a large part of western Nebraska was at the time of the passage of the act of 1862 not only unoccupied but unsurveyed. The speedy construction of the railroad to the Pacific was desired, and nothing was said about a condemnation of the right of way. By the amendatory act of 1864, however, provision was made for such condemnation through land occupied by an owner or claimant. In *Washington & Idaho Railroad Company* v. *Osborn*, 160 U. S. 103, it appeared that Osborn was a settler upon unsurveyed public land and had placed improvements thereon, and intended when the surveys were made to preëmpt the same under the preëmption laws of the Government. The railroad company was vested by the act of March 3, 1875, 18 Stat. 482, c. 152, with a right of way through the public lands of the United States, subject to the exception of "lands within the limits of any military park or Indian reservation, or other lands specially reserved from sale" (§ 5). Osborn did not come within the terms of this exception. The act of March 3, 1875, authorized the legislature of any Territory to provide the manner in which private lands and possessory claims of lands of the United States might be condemned, and further, that when no provision should have been made such condemnation might be made in accordance with § 3 of the act of July 2, 1864, *supra*. And upon this the court, sustaining Osborn's claim of payment for the right of way, said (p. 109):

"It must, therefore, be conceded that Osborn did not, by maintaining possession for several years and putting valuable improvements thereon, preclude the Government from dealing with the lands as its own, and from conferring them on another party by a subsequent grant.

"On the other hand, it would not be easy to suppose that Congress would, in authorizing railroad companies to traverse the public lands, intend thereby to give them a right to run the lines of their roads at pleasure, regardless of the rights of settlers."

It is true, as suggested in *Western Pacific Railroad Company* v. *Tevis*, 41 California, 489, 493, that the condemnation proceedings named by the act of July 2, 1864, were in territorial courts, whereas Kansas at that time was a State. But undoubtedly the thought of Congress was the protection of an owner or claimant by condemnation proceedings and not in what courts those proceedings should be had.

Further, "this right of way through school sections had been accepted without challenge for twenty years" (31 Fed. Rep. 541). This indicated the general understanding, and was significant. The contrary appears here. The railway company not only did not disturb the possession of the settler for nearly forty years, but on the other hand purchased and paid him for a right of way through the tract.

We are of opinion that the case of *Crier* v. *Innes*, 160 U. S. 103, is, as respects the case at bar, inconsistent with that in the 31st Fed. Reporter, and must be held to have to that extent overruled it. We do not think that it would be profitable to cite the many other cases which touch the question before us more or less closely, or to seek to point out the differences between them and this, or to notice all the general expressions which are to be found in them.

We are of opinion that the Supreme Court of Kansas did not err, and its judgment is

*Affirmed.*