The **ABSENTEE SHAWNEE TRIBE OF INDIANS OF OKLAHOMA, Daniel Little Axe, Governor, Plaintiff–Appellant,**

v.

The **STATE OF KANSAS,**
**Defendant–Appellee.**

No. 86–2600.

United States Court of Appeals,
Tenth Circuit.

Dec. 2, 1988.
Rehearing Denied Dec. 23, 1988.

Alvin D. Shapiro (Martha A. Fagg, Law Office of Alvin D. Shapiro, Kansas City, Mo., with him on the brief), Law Office of Alvin D. Shapiro, Kansas City, Mo., for plaintiff-appellant.

Robert T. Stephan (John W. Campbell, Deputy Atty. Gen., Topeka, Kan., on the brief), Atty. Gen., Topeka, Kan., for defendant-appellee.

Before McKAY, TACHA, and BRORBY, Circuit Judges.

TACHA, Circuit Judge.

The Absentee Shawnee Tribe of Indians of Oklahoma (Shawnees) appeal an order of summary judgment denying their claim to certain property located in Johnson County, Kansas. The issue on appeal is whether the Shawnees have superior title to this property under an 1854 treaty with the United States. We hold that they do not, and affirm.

The Shawnees seek possession and title to 11.97 acres of land located in Johnson County, Kansas, and known as the Shawnee Mission State Park. The State of Kansas (State), the current titleholder, derives its title to this land from a patent issued to the Rev. Thomas Johnson by the United States government in 1865. Prior to the issuance of the patent, the property in dispute was part of three sections of land granted to the Missionary Society of the Methodist Episcopal Church South in an 1854 treaty between the Shawnees and the United States. Treaty with the Shawnees, May 10–Sept. 28, 1854, United States–Shawnees, 10 Stat. 1053 [hereinafter 1854 Treaty].

■ The Shawnees contend that the patent through which the State claims title to the property is invalid because the Rev. Johnson, the original patentee, was dead at the time the patent was issued. At common law, a land patent to a deceased person is void. *Davenport v. Lamb*, 80 U.S. (13 Wall.) 418, 427, 20 L.Ed. 655 (1871). The Shawnees argue that, because of the invalidity of the patent, the 1854 Treaty makes them the rightful title holders of the property.

The district court granted summary judgment in favor of the State on the grounds that former 43 U.S.C. § 1152 (repealed October 21, 1976), a remedial statute in effect from 1836 to 1976, applied in this case to validate the patent to the Rev. Johnson. *Absentee Shawnee Tribe of Indians v. Kansas*, 628 F.Supp. 1112, 1117 (D.Kan.1985). This statute provided:

Where patents for *public lands* have been or may be issued, in pursuance of any law of the United States, to a person who has died before the date of such

patent, the title to the land designated therein shall inure to and become vested in the heirs, devisees, or assignees of such deceased patentee as if the patent had issued to the deceased person during life.

43 U.S.C. § 1152 (emphasis added). The district court rejected the Shawnees' argument that the statute was inapplicable to this case because the land in question was "Indian land," rather than "public land," under the terms of the 1854 Treaty. The Shawnees claim on appeal that the district court erred in this respect.

■ When reviewing a grant of summary judgment, we determine whether any genuine issue of material fact remains, and if not, whether the district court correctly applied the law. *Franks v. Nimmo*, 796 F.2d 1230, 1235 (10th Cir.1986). The parties do not dispute that the Rev. Johnson, the original patentee, died prior to the date the patent was issued. The dispute in this case is whether now-repealed 43 U.S.C. § 1152 operated to remove the patent from the normal common-law rule of invalidity, thereby validating the patent and preserving title in the State. The question presented here, therefore, is one of law: whether the disputed property constitutes "public land" under the remedial statute. We employ a de novo standard of review of this legal issue. *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).

I.

The meaning generally ascribed to "public lands" is "well settled." *Union Pac. R.R. v. Harris*, 215 U.S. 386, 388, 30 S.Ct. 138, 54 L.Ed. 246 (1910).

"The words 'public lands' are habitually used in our legislation to describe such as are *subject to sale or other disposal under general laws*." If it is claimed in any given case that they are used in a different meaning, it should be apparent either from the context or from the circumstances attending the legislation.

*Id.* (citations omitted) (emphasis added) (quoting *Newhall v. Sanger*, 92 U.S. 761,

763, 23 L.Ed. 769 (1875)). This meaning is consistent with the usage Congress intended in the remedial statute. *See Larkin v. Paugh,* 276 U.S. 431, 438, 48 S.Ct. 366, 368, 72 L.Ed.2d 640 (1928).

In order to determine whether the disputed property in this case is "public land," we must interpret the 1854 Treaty, which established a reservation for the Shawnees. We are not confronted with construing an act of Congress that opens Indian lands to settlement by non-Indians. The difference between interpreting a treaty and an act of Congress in this context is important. When interpreting a statute, Congress' intent as expressed in the statute is determinative. When interpreting a treaty, the intention of the Indians and the intention of the government are both considered.

"A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations." *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 *modified sub nom. Washington v. United States,* 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979).[1] The Supreme Court has declared, however, that the Indians are not sovereign foreign nations in the truest sense of that term, but "domestic dependent nations." *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). "[T]he relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else." *Id.* 30 U.S. (5 Pet.) at 16. "Their relation to the United States resembles that of a ward to his guardian." *Id.* at 17; *see also Choctaw Nation v. United States,* 119 U.S. 1, 27, 7 S.Ct. 75, 90, 30 L.Ed. 306 (1886). The dependent status of Indians has in some circumstances resulted in treaties being forced upon them without their consent. *See Choctaw Nation v. Oklahoma,* 397 U.S. 620, 630–31, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970). The Supreme Court has noted, however, in regard to Indian treaties that "[w]hen the signatory nations have not been at war and neither is the vanquished, it is reasonable to assume that they negotiated as equals at arm's length." *Washington State Commercial Passenger Fishing Vessel Ass'n,* 443 U.S. at 675, 99 S.Ct. at 3069. The terms of the treaty in this case were the product of at least some negotiation.[2] "Accordingly, it is the intention of *the parties,* and *not solely that of the superior side,* that must control any attempt to interpret the treaties." *Id.* (emphasis added).

With regard to acts of Congress subsequent to the establishment of the reservation, the courts adopt an interpretational policy against diminishing an Indian reservation. *See, e.g., Solem v. Bartlett,* 465 U.S. 463, 470, 104 S.Ct. 1161, 1166, 79 L.Ed. 2d 443 (1984); *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977); *Ute Indian Tribe v. Utah,* 773 F.2d 1087, 1088 (10th Cir.1985), *cert. denied,* 479 U.S. 994, 107 S.Ct. 596, 93 L.Ed.2d 596 (1986). Although it was once thought that Indian consent was necessary to diminish a reservation, it

---

1. The modification of *Washington State Commercial Passenger Fishing Vessel Association* pertained only to footnote 16 of that opinion. *See Washington v. United States,* 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979) (mem.). Footnote 16 is not germane to this court's use of that case.

2. In 1958, the Indian Claims Commission discussed the historical background of the 1854 Treaty. *Absentee Shawnee Tribe of Oklahoma,* 6 Ind.Cl.Comm'n Dec. 377 (June 19, 1958). By an act of Congress, the President was authorized to negotiate with the Shawnees for the purpose of " 'securing the assent of said tribes to the settlement of the citizens of the United States upon the lands claimed by said Indians, and for the purpose of extinguishing the title of said Indians in whole or in part to said lands.' " *Id.*

at 379 (quoting Act of March 3, 1853, ch. 104, 10 Stat. 226, 238). The Commissioner of Indian Affairs visited the lands reserved to the Shawnees in 1853, and met with a council of Shawnees. *Id.* at 379–80. The Commissioner returned to Washington, reporting that the Shawnees, " 'as their only reply, proposed to sell the United States one million of [sic] acres, reserving to themselves six hundred thousand (600,-000) acres adjoining the State of Missouri.' " *Id.* at 380. The Shawnee's tribal delegation pursued further negotiations in Washington over a two-week period in 1854. *Id.* at 380–81. The tribe and the Commissioner considered several different options and finally settled on the terms stated in the 1854 Treaty. *See id.*

has long been held that Congress has the power to diminish reservations unilaterally. *Solem*, 465 U.S. at 470 n. 11, 104 S.Ct. at 1166 n. 11 (citing *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903)). The "traditional solicitude for the Indian tribes," however, precludes the courts from diminishing Indian lands without "substantial and compelling evidence of a Congressional intention" to exercise its power to diminish Indian lands. *Id.* 465 U.S. at 472, 104 S.Ct. at 1167. As a general rule, "[o]nce a block of land is set aside for an Indian reservation and no matter what happens to the title of individual plots within the area, the entire block retains its reservation status until Congress explicitly indicates otherwise." *Solem*, 465 U.S. at 470, 104 S.Ct. at 1166. "Diminishment ... will not be lightly inferred." *Id.* Instead, "Congress [must] clearly evince an 'intent ... to change ... boundaries' before diminishment will be found." *Id.* (quoting *Rosebud Sioux Tribe v. Kneip*, 430 U.S. at 615, 97 S.Ct. at 1377).

The diminishment policy recognizes the fact that the terms of an act of Congress are often unilaterally imposed, rather than the product of negotiation between the Indians and the United States. Congress possesses the power to abrogate the terms of a treaty, "though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so." *Lone Wolf v. Hitchcock*, 187 U.S. 553, 566, 23 S.Ct. 216, 221, 47 L.Ed. 299 (1903). Although the Indians might theoretically have been represented in Congress, the character of that representation is obviously different from having direct representation on one side of the negotiating table, and thereby having the opportunity to shape the specific terms or correct an ambiguous term of a treaty.

■ Treaties, being the product of joint agreement, do not implicate the diminishment policy expressed in *Solem*. We nevertheless afford similar protections to the interests of Indians through adopting deferential standards when interpreting treaties. The Supreme Court has held that "the United States, as the party with the presumptively superior negotiating skills and superior knowledge of the language in which the treaty is recorded, has a responsibility to avoid taking advantage of the other side." *Washington State Commercial Passenger Fishing Vessel Ass'n.*, 443 U.S. at 675–76, 99 S.Ct. at 3069. We therefore interpret the 1854 Treaty in light of the Supreme Court's admonition that "enlarged rules of construction are adopted in reference to Indian treaties." *Kansas Indians*, 72 U.S. (5 Wall.) 737, 760, 18 L.Ed. 667 (1866). Indian treaties must be construed "so far as possible, in the sense in which the Indians understood them, and 'in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.' " *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943) (quoting *Tulee v. Washington*, 315 U.S. 681, 684–85, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942)); *see also Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. at 676, 99 S.Ct. at 3069; *Choctaw Nation v. United States*, 119 U.S. 1, 28, 7 S.Ct. 75, 90, 30 L.Ed. 306 (1886). "The language used in treaties with the Indians should never be construed to their prejudice. If words be made use of which are susceptible of a more extended meaning than their plain import, as connected with the tenor of the treaty, they should be considered as used only in the latter sense." *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832) (Marshall, C.J.); *see also Choctaw Nation v. United States*, 119 U.S. at 28, 7 S.Ct. at 90; *Kansas Indians*, 72 U.S. (5 Wall.) at 760. Ambiguous provisions are to be construed to the benefit of the Indians. *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985). Courts may not, however, "ignore plain language that, viewed in historical context and given a 'fair appraisal,' clearly runs counter to a tribe's later claims." *Oregon Dept. of Fish & Wildlife v. Klamath Indian Tribe*, 473

U.S. 753, 774, 105 S.Ct. 3420, 3432, 87 L.Ed. 2d 542 (1985) (quoting *Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. at 675, 99 S.Ct. at 3069).

With this interpretational framework in mind, we turn to examine the terms of the 1854 Treaty.

## II.

An overview of the historical context of the 1854 Treaty is helpful to understanding the character of the land in dispute in this case. The Shawnees held 1.6 million acres of land in what is now the State of Kansas pursuant to an 1825 treaty with the United States. *Kansas Indians*, 72 U.S. (5 Wall.) at 738. The combination of the "advancing tide of civilization," and the dwindling number of Shawnees, gave rise to the 1854 Treaty, which reduced the territorial limits of the Shawnee reservation. *Id.* at 753. "By this [1854] treaty the united Shawnee nation ceded to the United States all the large domain granted to them by the treaty of 1825. In consideration for this cession, two hundred thousand acres of these same lands were receded to them, and they also obtained annuities and other property." *Id.*

The Supreme Court has noted that the 1854 Treaty was "peculiar in some of its provisions." *Id.* In particular, despite the fact that the Treaty provides that the United States "cedes" 200,000 acres to the Shawnees, "[the 1854 Treaty] did not contemplate that the Indians should enjoy the whole [200,000 acre] tract." *Id.* Most relevant to the present case is the fact that the Shawnees were not to possess certain properties set apart for missionary organizations. Article 2 of the Treaty provides that "there shall *first be set apart* [from the 200,000 acre tract] to the Missionary Society of the Methodist Episcopal Church South, to include the improvements of the Indian Manual Labor School, three sections of land." 1854 Treaty, art. 2, 10 Stat. 1053, 1054 (emphasis added). The Treaty limits the Shawnees' initial choice of land to lands other than the property reserved to the mission. Article 2 provides that each Shawnee "shall be entitled to, *out of the*

*residue* of said two hundred thousand acres, if a single person, two hundred acres, and if the head of a family, a quantity equal to two hundred acres for each member of his or her family." *Id.* (emphasis added). The "residue" in this context is clearly that portion of the 200,000 acres remaining *after* there was "first set apart" lands to the Missionary Society and other missionary groups.

The property in dispute in this case is part of three sections of land that was "first ... set apart" to the Missionary Society of the Methodist Episcopal Church South in article 2 of the Treaty. *Id.* Article 6 of the Treaty defines the conditions of the grant to the Missionary Society:

> The grant to the Missionary Society of the Methodist Episcopal Church South, at the Indian Manual Labor School, shall be confirmed to said Society, or to such person or persons as may be designated by it, by patent, from the President of the United States, upon the allowance to the Shawnees, by said society, of ten thousand dollars, to be applied to the education of their youth; which it has agreed to make.

*Id.*, art. 6, 10 Stat. 1053, 1056. We find that articles 2 and 6 unambiguously contemplate a sale of the mission property to the Missionary Society or its designee for consideration of $10,000. The mission property therefore satisfies the definition of public lands by being "subject to sale or other disposal under general laws." *Union Pac. R.R.*, 215 U.S. at 388, 30 S.Ct. at 138.

Furthermore, article 2 expressly provides that "the said Indians hereby cede, relinquish, and convey to the United States, all tracts or parcels of land which *may be sold, or are required to be sold* in pursuance of any article of this instrument." 1854 Treaty, art. 2, 10 Stat. 1053, 1056 (emphasis added). The mission property was therefore receded to the United States, which held title until payment of the $10,000 specified by the Treaty. The fact that the property was receded to the United States pursuant to article 2 also supports the conclusion that the property was "pub-

lic land," rather than Shawnee land, because the United States held title to the property.[3]

### III.

The Shawnees attempt to avoid this construction of the Treaty and the conclusion which follows—that the disputed mission property is "public land"—by arguing that the Treaty merely authorizes the United States to act as the Shawnees' sales agent in disposing of the property. They contend that the treaty provisions in this case, like the surplus land acts discussed in diminishment cases such as *Solem*, " 'did no more than to open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards.' " *Solem*, 465 U.S. at 473, 104 S.Ct. at 1167 (quoting *Seymour v. Superintendent*, 368 U.S. 351, 356, 82 S.Ct. 424, 427, 7 L.Ed.2d 346 (1962)).

As stated by the Supreme Court, "[w]hether or not the government became trustee for the Indians or acquired an unrestricted title by the cession of their lands, *depends in each case upon the terms of the agreement or treaty by which the cession was made.*" *Ash Sheep Co. v. United States*, 252 U.S. 159, 164, 40 S.Ct. 241, 242, 64 L.Ed. 507 (1920) (citations omitted) (emphasis added). The Shawnees admittedly have some support for their position in the literal language of the Treaty. Article 2 provides that "[a]ll the land selected, as herein provided, west of said parallel line, and that set apart to the respective societies for schools, and to the churches before named, shall be considered as part of the two hundred thousand acres *reserved* by the Shawnees." 1854 Treaty, art. 2, 10

Stat. 1053, 1054. By construing the term "reserved" in its technical sense, there is an argument that all of the land was Indian land, including the mission property, and that the United States was merely the agent of the Indians in selling the property. Reading the Treaty as a whole, however, and interpreting the terms as they would have been understood by the Indians, we nevertheless conclude that the United States was not merely the agent of the Indians.

First, the use of the term "reserved" in this context is highly suspect given the fact that the first sentence of article 2 had originally contained the term "reserved," but was subsequently amended to omit that term. *Id.*, amendments, 10 Stat. 1053, 1059. In the original draft of the Treaty, the Shawnees were to have reserved the 200,000 acre tract out of the 1.6 million acres they ceded to the United States. Instead, the Shawnees ceded the entire 1.6 million acre tract to the United States, and the United States receded two hundred thousand acres to them.[4] Article 2's original provision referring to the land within the boundaries defined in article 1, "[t]he two hundred thousand acres of land reserved by the Shawnees," was therefore amended to read "[t]he United States hereby cede to the Shawnee Indians two hundred thousand acres of land to be selected between [specified boundaries]." *Id.*, art. 2, 10 Stat. 1053, 1054; *id.*, amendments, 10 Stat. 1053, 1059. In this context, therefore, the term "reserved" is merely a means of describing the two hundred thousand acres of land in which they would have the right to select property, and it does not necessarily indicate that the Shawnees understood that all of the land was, and would always be, "Indian land."

---

**3.** In determining congressional intent to diminish Indian land, the *Solem* Court found critical the facts that (1) the act in question made explicit reference to *cession* of the land; and (2) Congress made an unconditional commitment to compensate the Indian tribe for the land. The Court held that when this is the case "there is an almost insurmountable presumption that Congress meant for the tribe's reservation to be diminished." *Solem*, 465 U.S. at 470–71, 104 S.Ct. at 1166. Although diminishment concerns

are not implicated in this case, we find these same factors persuasive here in interpreting the intent of both the Indians and Congress.

**4.** As discussed above, the term "cession" was not understood to have provided full rights of title in all of the lands within the specified boundaries, but only in the lands which they would eventually select under article 2.

Second, the historical record indicates that the Shawnees understood that the Treaty entitled the Rev. Johnson to the property under the Treaty, and that they intended him to have it. When another treaty was pending in the Senate in 1864, which would have required the mission property to be sold because the Missionary Society had not fulfilled the terms of the 1854 Treaty and had breached the terms of an 1855 contract by which the Missionary Society was to provide educational services to the Shawnees, the Shawnees petitioned the Commissioner of Indian Affairs to use his influence to prevent the sale. Their reasons stated in the petition were as follows:

1st Because said sale would be in conflict with and in violation of vested rights acquired under the stipulations of certain contract made by virtue of the authority of said 6th Section of the treaty of 1854 by the Commissioner of Indian Affairs with the Missionary Society of the Methodist Episcopal Church—

2nd Because we as a tribe desire to act in good faith towards said church or its assigns believing that said church has to the best of its ability fulfilled its part of said contract

3d Should the said land be sold as provided in said treaty, Thomas Johnson would be the sufferer. Mr. Johnson has Spent near 26 years of the prime of his life in teaching us and our children: 18 years of which was without pay from us or the United States

4th It was the wish and intention of our tribe at the time of making said treaty of 1854 to give Said Johnson said three Sections of land

5th We did not desire the insertion of Said clause in said treaty of 1864 but were advised contrary to our wishes to assent thereto—

6th We do not believe that said lands would sell for a sum sufficient to pay for the improvements made by said church upon said land, thereby leaving the tribe in debt.

Letter from Chiefs and Council of the Shawnee Tribe of Indians to William P. Dole, Commissioner of Indian Affairs (January 17, 1865) (original handwritten). The letter requested that the government resolve its dispute with the mission by settling any balance found due on the mission property out of the debt the government owed to Johnson. *See id.* This letter supports the conclusion that the Shawnees were fully cognizant of the effect of the 1854 Treaty in divesting their rights in the mission property. Even after the mission had discontinued providing educational services, the Shawnees clearly did not contemplate that they had any continued claim in the property. This is a case in which we cannot "ignore plain language that, viewed in historical context and given a 'fair appraisal,' clearly runs counter to a tribe's later claims." *Klamath Indian Tribe*, 473 U.S. at 774, 105 S.Ct. at 3432 (quoting *Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. at 675, 99 S.Ct. at 3069).

Any further doubt about the invalidity of the Shawnees' agency argument has been dispelled by the Supreme Court's interpretation of the 1854 Treaty in *Walker v. Henshaw*, 83 U.S. (16 Wall.) 436, 21 L.Ed. 365 (1872). The Court in *Walker* held that the Shawnees essentially held equitable title in all unselected lands *capable of being claimed by a tribal member* until the land was opened to settlement by non-Shawnees in accordance with the terms of the Treaty:

[U]ntil the privilege [of selecting their lands within the limits of the reservation] was exhausted, the land, in any proper sense, belonged to them. In surrendering the larger part of their immense possessions to relieve the government from the predicament in which it was placed by the advancing tide of white population, they did not part with any right in the lesser part reserved by them as long as the claim of any single member of the tribe, according to the terms of the treaty, was unsatisfied.

*Id.* 83 U.S. (16 Wall.) at 443. Article 2 essentially gives the Shawnees five years to select their lands, and provides for the sale of unselected lands, with the proceeds applied to their benefit. 1854 Treaty, art. 2, 10 Stat. 1053, 1055. Article 5 protects

this right of selection by providing that "no white persons or citizens shall be permitted to make locations or settlements within [the 200,000 acre tract], until after all of the lands shall have been surveyed, and the Shawnees shall have made their selections and locations, and *the President shall have set apart the surplus.*"[5] *Id.*, art. 5, 10 Stat. 1053, 1056 (emphasis added).

The President's proclamation of July 9, 1858, opened unclaimed lands to settlement by non-Shawnees and extinguished the Shawnees' rights in land unclaimed by members of their tribe. *See Walker*, 83 U.S. (16 Wall.) at 445–46. When the President set apart the lands unclaimed by the Shawnees and opened such lands to preemption and settlement pursuant to articles 2 and 5 of the 1854 Treaty, such lands were "declared to be *public lands.*" *Id.* at 446 (emphasis added).

Although *Walker* did not specifically involve the disputed mission land in this case, the Court's holding that the Shawnees' rights in the unclaimed land prevented non-Shawnees from obtaining title "*until* the proclamation of the President of the 9th of July, 1858," *id.* at 445 (emphasis added), has significant implications for this case. By noting that the Presidential proclama-

tion "declared [lands unclaimed by the Shawnees] to be public lands", *id.* at 446, the Court dispelled any implication that the United States was merely an agent of the Shawnees and that the Indian character of the lands remained intact after the sale. *Cf. Ash Sheep*, 252 U.S. at 166, 40 S.Ct. at 242 (finding agency relationship when treaty explicitly stated, "the United States shall act as trustee for said Indians"). On the contrary, the Presidential proclamation of July 9, 1858, effectively extinguished an equitable title that the Shawnees held in land not previously selected by a Shawnee. After each Shawnee had received his or her two hundred acre entitlement,[6] the Treaty clearly allowed unclaimed land to be sold to non-Shawnees. Articles 2 and 6 of the Treaty limited the Shawnees' rights regarding lands to be sold to having payments for such land applied to their benefit. 1854 Treaty, art. 2, 10 Stat. 1053, 1054; *id.*, art. 6, 10 Stat. 1053, 1056. The parties do not dispute that such payments were made with regard to the mission property.[7]

 The terms of the Treaty, therefore, were understood by both parties to contemplate that the mission property was "public land," and not land that was "reserved" to

---

5. With regard to surveyance, article 5 states that the lands within the defined boundaries "shall be surveyed, *in the same manner as the public lands of the United States are surveyed.*" 1854 Treaty, art. 5, 10 Stat. 1053, 1056 (emphasis added). The Shawnees argue that by using the terms "in the same manner as public lands," the Treaty implicitly recognizes that only nonpublic or Indian lands will be surveyed. Even if we accept the argument that the Treaty would not use the terms "same manner as public lands" if it were not referring to nonpublic lands, our construction of the Treaty does not deny that there are nonpublic lands, as well as public lands, within the area defined in article 1. As the later case of *Kansas Indians* demonstrates, the lands that the Shawnees selected and continued to own were held to be Indian lands which were exempt from taxation. *Kansas Indians*, 72 U.S. (5 Wall.) at 760–61. Simply because some of the land to be surveyed constituted Indian land, does not support the proposition that all of the lands were Indian land.

6. The Treaty provided that a Shawnee who was a "single person" was entitled to 200 acres, while a Shawnee who was a "head of a family" was entitled to 200 acres "for each member of

his or her family." The Treaty further provided that the land to which these Shawnees were entitled should "include, in every case, the improvement on which such person or family now resides; and if two or more persons or families occupy the same improvement, or occupy different improvements in such close proximity, that all of such persons or families cannot have the quantity of land (to include their respective improvements) which they are entitled to, and if in such cases the parties should be unable to make an amicable agreement among themselves, the oldest occupant or settler shall have the right to locate his tract so as to include said improvements, and the others must make a selection elsewhere, adjoining some Shawnee settlement." 1854 Treaty, art. 2, 10 Stat. 1053, 1054.

7. The historical record indicates that the Shawnees received $10,000 as promised in the Treaty. The Missionary Society liquidated $8,000 of the debt by performing educational services pursuant to a contract with the Commissioner of Indian Affairs. The balance was paid by the Rev. Johnson's estate through a setoff of $2,000 from a $7,500 debt owed to the estate by the United States.

the Shawnees as Indian land in a technical sense. The mission property was not selected by the Shawnees under article 2 of the Treaty. On the contrary, article 2 restricts their choice of land to the "residue" left after the grant to the missionary groups. *Walker* limits the Shawnees' rights to the property they actually claimed under the Treaty, and the mission property, falling outside that category, is "public land."

The remedial statute applies in this case to validate the patent issued posthumously to the Rev. Johnson, and we uphold the State's title to the property. The district court's grant of summary judgment in favor of the State is therefore AFFIRMED.